# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **J.B., a minor, by her Father and next friend, Guy Blume, et al.,** | **Case No. 4:22CV1752** |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| | **MEMORANDUM OPINION & ORDER** |
| **Liberty Local Schools,** | |
| **Defendant.** | |

This matter is before the Court on the *pro se* Motion of Plaintiff Guy Blume for Leave to File an Amended Complaint or, in the alternative, for Voluntary Dismissal, filed March 3, 2025.  (Doc. No. 69.)  Defendant Liberty Local Schools filed a Brief in Opposition on April 1, 2025, to which Plaintiff Blume filed a *pro se* Reply Brief on April 7, 2025  (Doc. Nos. 72, 73.)

On June 18, 2025, this Court issued an Order appointing *pro bono* counsel to represent Plaintiffs J.B. (a minor, by her Father and next friend Guy Blume) and Guy Blume.  Thereafter, on August 22, 2025, Plaintiffs J.B. and Blume, through *pro bono* counsel, filed a Motion to Amend Complaint.  (Doc. No. 78.)  Defendant filed a Brief in Opposition on September 5, 2025, to which Plaintiffs J.B. and Blume replied on September 12, 2025.  (Doc. Nos. 82, 83.)

For the following reasons, Plaintiff Blume's *pro se* Motion for Leave to File an Amended Complaint or, in the alternative, for Voluntary Dismissal (Doc. No. 69), filed in March 2025, is DENIED on the grounds that it is superseded by Plaintiffs' Motion to Amend Complaint  (Doc. No.

78), filed in August 2025.  Plaintiffs' August 2025 Motion to Amend Complaint (Doc. No. 78) is DENIED. [1]

## I.    Facts

### A.    J.B. reports that she was sexually assaulted at Liberty Local Middle School

Plaintiff J.B. moved to Youngstown, Ohio in 2017 to live with her father, Plaintiff Guy Blume (hereinafter "Plaintiff Blume" or "Blume"), and her step-mother, Lynn Blume.  (Deposition of J.B. (Doc. No. 48-1) at Tr. 17;[2] Deposition of Guy Blume (Doc. No. 47-1) at Tr. 4-5, 9.)  J.B. was nine years old at the time, and was enrolled in the Liberty Local School District as a fourth grader.  (J.B. Depo. at Tr. 17, 26.)  During her fourth, fifth, and sixth grade years at Liberty Local, J.B. was a good student and received A's and B's in her classes.  (*Id*. at Tr. Tr. 27-31; Blume Depo. at Tr. 9.)  She recalled receiving only one detention during this time period and did not recall that her parents ever made any complaints to the school.  (J.B. Depo. at Tr. 27-31; Blume Depo. at Tr. 10.)

During the 2021-2022 school year, J.B. was twelve (12) years old and in the 7th grade.  (J.B. Depo. at Tr. 13, 28.)  Grade 7 was located in the Liberty Local Middle School, which is in the same

---

[1] The Court notes that the parties' cross Motions for Summary Judgment (Doc. Nos. 52, 53), and Defendant's Motions to Strike related thereto (Doc. Nos. 62, 64), remain pending.  The Court will issue a separate Memorandum Opinion & Order resolving these Motions in due course.

[2] The Court notes that Defendant's counsel filed an unredacted version of J.B.'s deposition transcript and exhibits on the public docket, despite the fact that these documents contain J.B.'s full name, date of birth, personal contact information (including her personal email address), and sensitive medical information.  *See* Doc. No. 48-1, 48-2.  In addition, both Plaintiffs' former counsel (Attorney David Engler) and Defendant's counsel filed other deposition transcripts on the public docket that likewise contain sensitive personal identifying information, including references to J.B.'s and D.P.'s full names, J.B.'s personal cell phone number, the deponents' dates of birth, and summaries of D.P.'s juvenile court proceedings.  For this reason, the Court has since restricted access to the deposition transcripts of J.B., Guy Blume, Akesha Joseph, and David Walker.  The Court notes that it is deeply concerned regarding the complete failure of both Plaintiffs' former counsel and Defendant's counsel to demonstrate any care whatsoever for either J.B.'s or D.P.'s privacy. Counsel are reminded that Local Rule 8.1 prohibits the filing of personal identifying information on the public docket (including the full names of minor children, and dates of birth), and are hereby ordered to fully comply with this Rule in any future filings in this District.

building as Liberty Local High School.  (Deposition of D. Walker (Doc. No. 49-1) at Tr. 10.)  At all times relevant herein, David Palmer was the Junior High School Principal, and Akesha Joseph was the High School Principal and Title IX Coordinator.  (*Id*. at Tr. 21; Deposition of A. Joseph (Doc. No. 50-1) at Tr. 9, 17-18, 21.)

During the summer prior to the beginning of her 7th grade school year, J.B. met a male student, D.P., who was also entering the 7th grade at Liberty Local.  (J.B. Depo.at Tr. 74.)  They began talking on the phone and "snapping" on Snapchat.  (*Id*. at Tr. 74-76.)  When school started, D.P. was not in any of J.B.'s classes, but they saw each other every day during lunch and in the hallways between classes.  (*Id*. at 79-80.)  They also met once at a football game, where they held hands and kissed.  (*Id*. at Tr. 81-82)  J.B. testified that they were boyfriend and girlfriend but that (prior to the incident discussed below) they had never had sex or talked about sex.  (*Id*. at Tr. 81, 88.)

On November 18, 2021, J.B. and D.P. arranged to meet in a second floor school bathroom.  (*Id*. at Tr. 91-93.)  J.B. testified that they were "trying to figure out somewhere to meet up where they wouldn't get in trouble for being in the hallways."  (*Id*. at Tr. 93.)  J.B. testified that they wanted to find a place where they could talk and kiss.  (*Id.* at Tr. 95-97.)  They came up with a plan where another classmate secured the key to the second floor bathroom[3] and then gave the key to D.P. while he was in the in-school suspension (or "ISS") room, which was supervised by intervention specialist David Walker.  (*Id*. at Tr. 94-95.)  Meanwhile, J.B. was in a nearby study hall, which was supervised

---

[3] Principal Joseph testified that the second floor bathroom was a student bathroom.  She explained that there were periods of time when they would lock the bathroom door and students would need to get a key from a teacher to access the bathroom.  (Joseph Depo. at Tr. 37, 85-86.)  J.B. testified that the door to this particular bathroom was typically locked, and that the only time it was unlocked was when a student in the in-school suspension room was able to get the key from Mr. Walker.  (J.B. Depo. at Tr. 72-73.)

3

by Mr. Palmer.  (*Id*. at Tr. 94-95, 98.)  When J.B. saw D.P. leave the ISS room to go to the bathroom, J.B. asked to be excused from study hall to get her Chromebook, which she had intentionally left in the cafeteria.  (*Id*. at Tr. 98.)  J.B. was given permission to get her Chromebook.  (*Id*.)  She retrieved her Chromebook from the cafeteria and then went to the second floor bathroom.  (*Id*.)

The bathroom door was unlocked and D.P. was inside.  (*Id*. at Tr. 98-99.)  J.B. testified that she and D.P. began kissing.  (*Id.* at Tr. 106.)  She testified that D.P. tried to pull her pants down and grabbed her hips.  (*Id*.)  J.B. stated that she told D.P. to please stop because he was hurting her, but "he said he doesn't care."  (*Id*.)  J.B. testified that she screamed loudly but nobody was in the hallway at the time.  (*Id*. at Tr. 107-108.)  She further testified that she tried to leave the bathroom, but D.P. grabbed her, flipped her over, and raped her.  (*Id.* at Tr. 106.)  During her deposition, J.B. stated repeatedly that, while the initial kissing was consensual, she did not consent to having sex with D.P. (*Id*. at Tr. 104, 109-110.)

After D.P. left, J.B. found her clothes and got dressed.  (*Id*. at Tr. 110-111.)  Her underwear was bloody and her leg was bruised.  (*Id*. at Tr. 111, 117.)  She was upset and crying.  (*Id.* at Tr. 111, 113.)  J.B. returned to study hall, where she continued to cry.  (*Id*.)  She estimated that, by the time she returned to study hall, she had been gone for about 30 minutes.  (*Id*. at Tr. 108, 110.)  Mr. Palmer gave her tissues and asked if she was okay.  (*Id*. at 111, 113.)  J.B. said that she was.  (*Id*.)  She testified that, at that time, she did not feel ready to tell Mr. Palmer (or any teacher) about what had happened in the school bathroom.  (*Id*. at Tr. 112-113.)  J.B. went to gymnastics after school and noticed "a lot of blood."  (*Id*. at Tr. 115.)  She did not tell anyone at gymnastics about what had happened in the school bathroom, nor did she tell her father and/or stepmother.  (*Id*. at Tr. 115-116.)

J.B. did, however, tell her friends.  (*Id*. at Tr. 112, 123.)  Over the next several days, her friends told other students and "that's when the sides began."  (*Id*. at Tr. 113.)  Specifically, J.B's friends told her that "rumors were going around" and that some people were saying that she was raped while others were saying that she was lying and that she had "wanted it."  (*Id*. at Tr. 123-124.)  One of J.B.'s friends encouraged her to tell a teacher.  (*Id*. at 124.)

On December 2, 2021, J.B. took her friend's advice.  (*Id*. at Tr. 119, 124.)  J.B. and her friend approached J.B.'s English teacher, Todd Smith.  (*Id*. at Tr. 124; Deposition of Teresa Long (Doc. No. 51-1) at Tr. 12.)  Mr. Smith then called educational assistant, Teresa Long, and asked Ms. Long to take J.B. to talk to Mr. Walker.  (Long Depo.  at Tr. 12; J.B. Depo. at Tr. 124-125.)  J.B. reported to Mr. Walker and Ms. Long that D. P. had raped her in the school bathroom.  (Long Depo. at Tr. 14; Walker Depo. at Tr. 19-20; J.B. Depo. at Tr. 125-126.)  J.B. was tearful and crying.  (Long Depo. at Tr. 14.)  Mr. Walker and Ms. Long determined that this was "above their pay grade" and attempted to reach Junior High School Principal Palmer.  (*Id*. at Tr. 15-16; Walker Depo. at Tr. 14-16.)  Principal Palmer was not in the building, however, so they called High School Principal (and Title IX Coordinator) Akesha Joseph.  (Long Depo. at Tr. 15-16; Walker Depo. at Tr. 20-21.)

Mr. Walker advised Principal Joseph that "they had a student who alleged she had been sexually assaulted" and asked her what they should do.  (Walker Depo. at Tr. 22; Joseph Depo. at Tr. 21-22.)  Principal Joseph told them to keep J.B. away from other students until she (Joseph) was ready to speak to J.B.  (Walker Depo. at Tr. 22.)  Principal Joseph then called Plaintiff Blume and asked him and Mrs. Blume to come to the school.  (Joseph Depo. at Tr. 25.)  Principal Joseph testified that she also called the School Resource Officer and the Superintendent.  (*Id*.)  She then asked Ms. Long to bring J.B. to Joseph's office.  (*Id*. at Tr. 25-26; Long Depo. at Tr. 16.)

**B.      December 2, 2021 Meeting with Principal Joseph**

Ms. Long escorted J.B. to Principal Joseph's office, and Plaintiff Blume and Mrs. Blume arrived shortly thereafter.  (J.B. Depo. at Tr. 126-127; Long Depo. at Tr. 16.)  Principal Joseph began by advising the Blumes that J.B. had reported that she had been raped in the school bathroom.  (Blume Depo. at Tr. 29; Joseph Depo. at Tr. 26, 28.)  Plaintiff Blume was "taken aback" and both parents were "visibly upset."  (Joseph Depo. at Tr. 28.)  According to Principal Joseph, the Blumes began asking J.B. questions about who the boy was and what exactly had happened.  (*Id.* at Tr. 26.)  J.B. tried to answer the questions but started to "get a little overwhelmed" and "really emotional."  (*Id.* at Tr. 26, 28.)

Principal Joseph then discussed the next steps that Liberty Local would be taking to address the situation.  The record reflects that the parties have different recollections regarding exactly what Principal Joseph said in this regard.  According to Blume and J.B., Principal Joseph advised them that (1) D.P. would be removed from the school; (2) J.B. would be "protected;" and (3) Liberty Local would "fully investigate" the situation.  (Blume Depo. at Tr. 30-31; J.B. Depo. at Tr. 127-128.)  J.B. further testified that Principal Joseph indicated she would notify both the Liberty Local Police Department[4] and Children's Protective Services.  (J.B. Depo. at Tr. 128.)  Blume testified that Principal Joseph also indicated that the Blumes would receive a "Title IX letter" and offered to make counseling services available for J.B.  (Blume Depo. at Tr. 31.)

---

[4] J.B. and Principal Joseph testified that a school resource officer was present during the December 2, 2021 meeting in Principal Joseph's office, and that this officer was a member of the Liberty Police Department.  (Joseph Depo. at Tr. 29, 41; J.B. Depo. at Tr. 136.)  Blume testified that there was not a school resource officer present during the December 2, 2021 meeting.  (Blume Depo. at Tr. 29.)

6

Principal Joseph testified that she notified J.B. and the Blumes that she would conduct an "objective investigation of the situation."  (Joseph Depo. at Tr. 29.)  Because J.B. was not certain of the exact date on which the incident had occurred, Principal Joseph stated that she would try to gather details that would help her "narrow down a timeline," including examining school records, talking to teachers and staff, and attempting to find security camera footage in the vicinity of the second floor bathroom.  (*Id.* at Tr. 26-27, 29, 31.)  Principal Joseph also advised J.B. and the Blumes that she would need to speak with D.P. and take his statement.  (*Id.* at Tr. 29.)  Principal Joseph explained that, because J.B. was alleging that a crime had been committed, the school would need to report the matter to the police[5] and to Children's Services.  (*Id.*)  Principal Joseph testified that she made sure to advise J.B. and the Blumes that Liberty Local had counselors and "some auxiliary services through different agencies that … would just support [J.B.], talk to her, you know, check in with her … throughout the process."  (*Id.* at Tr. 30, 48.)

According to Principal Joseph, she then advised that, in a situation such as this, Liberty Local "usually employ[ed] strict measures to protect both students."  (*Id.* at Tr. 31.)  She testified that she informed J.B. and the Blumes that she would ask D.P. to come in with his mom the next day to "get their statement and then that way we know how we need to proceed to get through the school day."  (*Id.*)  Principal Joseph stated that she assured J.B. and the Blumes that she would make sure J.B. and D.P. did not have any classes together.  (*Id.*)  She also advised that she "would put the teachers on alert," i.e., that she would instruct teachers to "keep an eye out" in the hallways and make sure that J.B. and D.P. have "no contact."  (*Id.* at Tr. 31, 34, 47-48.)  Lastly, Principal Joseph advised Blume

---

[5] Principal Joseph testified that the school resource officer was a Liberty police officer; he was present during the meeting; and he was "taking down … [a] statement of what was being said" during that meeting.  (Joseph Depo. at Tr. 29, 41.)

7

that she would do a "full objective investigation" and would "report back to him as [she] found out information." (*Id.* at Tr. 31.)

After her meeting with J.B. and the Blumes, Principal Joseph notified Children's Services and Junior High School Principal Palmer. (*Id.* at Tr. 33, 50.) She also reached out to the school counselor and confirmed that J.B. and D.P. had no classes together. (*Id*. at Tr. 34.) Principal Joseph alerted the teachers that "there is an allegation that's being made between these two students" and that teachers should be "on vigorous watch" to ensure that there is "no contact" between J.B. and D.P. (*Id*.) Finally, Principal Joseph called D.P.'s mother and advised her that she and D.P. needed to come to the school the following day. (*Id*. at Tr. 33.)

On December 3, 2021, Principal Joseph met with D.P. and his mother. (*Id*. at Tr. 33.) D.P. denied sexually assaulting J.B. (*Id*.) According to Principal Joseph, "his story was pretty much the opposite of" J.B.'s. (*Id*.) Principal Joseph advised D.P. and his mother that the school "would have to do a full objective investigation of the situation to try to determine what happened." (*Id*.) In addition, Principal Joseph told D.P. that he was under "strict orders" to have "zero contact" with J.B. (*Id*. at Tr. 34, 50.) Specifically, Principal Joseph testified that she told D.P. that he was not to make eye contact with J.B. or make any gestures or references towards her and that, "if [he] saw [J.B.] coming, [he was to] walk the other way." (*Id*. at Tr. 50.) She also testified that she advised D.P. that there was to be "no social media, no posts, no emails, no tell a friend, none of that" regarding the situation with J.B. (*Id*. at Tr. 34, 50.)

Principal Joseph testified that, at the time of the investigation, she did not believe that Liberty Local's Title IX policy was "triggered" by J.B.'s complaint because "there was no alleged discrimination or anything at the time or alleged throughout the investigation" and "no allegations of

… unequal or unfair treatment." (*Id*. at Tr. 59-62.) Rather, she believed that J.B.'s complaint was a complaint that a crime (i.e., sexual assault) had been committed. (*Id*. at Tr. 58-59, 61, 67.)

### C.    J.B. continues to encounter D.P. at school, is harassed by other students, and enrolls in online instruction

J.B. returned to school on Friday, December 3, 2021 and Monday, December 6, 2021.[6] (J.B. Depo. at Tr. 131.) It is undisputed that D.P. was in school on both of those days. J.B. testified that, on both days, she saw D.P. in the hallway and during the lunch period. (*Id*. at Tr. 129-131.) Indeed, J.B. testified that, on at least one of those days, D.P. sat at J.B.'s lunch table, despite the fact that the teachers were supposed to be "on alert" and D.P. was under "strict orders" to have "no contact" with J.B. (*Id*. at Tr. 131.) J.B. also testified that, on both days, she was harassed by D.P.'s friends in the hallway and bathroom. (*Id*. at Tr. 132-135.) Specifically, J.B. testified that D.P.'s friends called her a liar and said that J.B. had led D.P. on and that she "wanted it." (*Id*. at Tr. 133.) J.B. also stated that D.P.'s new girlfriend wanted to fight her. (*Id*.) J.B. testified that she told Mr. Walker that D.P.'s friends were harassing her, to which he allegedly replied: "just don't go to the bathroom anymore." (*Id*. at Tr. 134-135.)

Blume testified that, on J.B.'s first day back at school (i.e., on Friday, December 3, 2021), J.B. called home and was upset and "miserably shaken" because D.P. was still at school and "people were taking sides." (Blume Depo. at Tr. 32-33, 41-42.) J.B. told Blume that she was being treated differently and that the teachers were "hugging D.P." in the hallway. (*Id*. at Tr. 33-35.) She also

---

[6] J.B. and Blume testified that J.B. returned to Liberty Local on two days after reporting the incident to Principal Joseph on Thursday, December 2, 2021. During deposition, the second day was sometimes referred to as December 4, 2021. However, December 4, 2021 is a Saturday. Thus, the Court construes J.B. and Blume's testimony as indicating that J.B. returned to Liberty Local on Friday, December 3, 2021 and Monday, December 6, 2021.

told Blume that there were girls threatening to fight her, and that she did not feel safe in school.  (*Id*.)  Blume contacted the school counselor but "nobody reached back" to him.  (*Id*. at Tr. 37.)

Blume testified that, on J.B.'s second day back at school (i.e., on Monday, December 6, 2021), Mr. Palmer called to advise him that "a lot of kids [were] fighting with [J.B.] about what's happened."  (*Id*. at Tr. 43-44.)  According to Blume, Mr. Palmer stated that he was concerned for J.B.'s safety.  (*Id*. at Tr. 43.)  Blume immediately came to the school to pick up J.B.  (*Id*. at Tr. 43-44.)  When he arrived, Mr. Palmer allegedly told Blume that "they didn't know how they could keep things under control at this school" and that he (i.e., Mr. Palmer) did not know "if they can keep [J.B.] safe."  (*Id*. at Tr. 44-45.)  According to Blume, both Mr. Palmer and Principal Joseph told him that "it might be a good idea" to remove J.B. from the school.[7]  (*Id*. at Tr. 45-46.)

Blume then immediately cleaned out J.B.'s locker and removed her from the school.  (*Id*. at Tr. 45-47.)  He testified that he "had no choice" because "my kid was in danger there."  (*Id*. at Tr. 46.)  He further testified that Liberty Local "did absolutely nothing to help J.B.;" "nobody had control over the kids" at the Middle School; and that J.B. was not going to be able to get an education at Liberty Local under the circumstances.  (*Id.* at Tr. 35-36.)  Blume enrolled J.B. in Liberty Local's remote learning program, which she participated in until transferring to a different school district later during the 7th grade school year.  (*Id*. at Tr. 46.)

### D.    Continued Investigation and Aftermath of November 2021 Incident

Meanwhile, Principal Joseph continued her investigation. Principal Joseph first spent considerable effort trying to narrow down when the incident occurred.  (Joseph Depo. at Tr. 35-37.)

---

[7] Principal Joseph implicitly disputed Mr. Blume's testimony on this point when she testified that she was "shocked" to learn that J.B. was no longer attending in-person classes at Liberty Local.  (Joseph Depo. at Tr. 55.)

Using school records of when D.P. was in the ISS room, she narrowed it down to a particular week in November 2021.  (*Id.*)  Principal Joseph then attempted to access security footage from that particular week, but was unable to retrieve it.  (*Id.*)  She contacted the school technology coordinator, who investigated and informed her that the footage was unavailable because the security cameras only stored footage for the previous twelve (12) days.  (*Id.* at Tr. 36.)  Principal Joseph testified that she called Blume and advised him that the footage did not go back far enough to capture the incident.[8] (*Id.* at Tr. 37.)

Principal Joseph then talked to an unidentified teacher, who explained about the locked second floor bathroom and the key.  (*Id.* at Tr. 38.)  She also talked to various teachers that were "in the area" to see if they recalled any days when J.B. came back to class "and maybe was a little distraught."  (*Id.* at Tr. 38-39.)  Principal Joseph was unable to draw any kind of definitive conclusion about what had happened based on her investigation, so she reached out to the school resource officer, Sergeant Shuster with the Liberty Police Department, and Children's Services "to see if they had gathered anything that could be helpful to us in our investigation."  (*Id.* at Tr. 39-41.)  Principal Joseph testified that, at that point, her investigation "hit a little bit of a dead end."  (*Id.* at Tr. 40.)

Once J.B. left the Liberty Local School District, Principal Joseph "never got any additional information."  (*Id.*)  Principal Joseph never wrote a final investigation report because, from her perspective, the investigation had not concluded.  (*Id.* at Tr. 41-42.)  She testified that the investigation was still open when she took medical leave from Liberty Local in October 2022.  (*Id.* at Tr. 42-44, 90.)

---

[8] By contrast, Blume testified that Principal Joseph called him on December 3, 2021 and told him that she knew exactly how long J.B. and D.P. were out of class because "there was a tape." (Blume Depo. at Tr. 38-39.)  Principal Joseph expressly denied saying this, testifying that "there was no video."  (Joseph Depo. at Tr. 101-102.)

During the week following the meeting with Principal Joseph, J.B. went to the Akron Children's Rape Crisis Center for a rape assessment.  (J.B. Depo. at Tr. 129, 137; Blume Depo. at Tr. 51.)  J.B. also spoke to the police several times and to Children's Services.  (J.B. Depo. at Tr. 137-138.)  Blume testified that, after the incident, J.B.'s "mental health went downhill."  (Blume Depo. at Tr. 48.)  He stated that J.B.'s eating disorder worsened, and that she attempted to harm herself.  (*Id.* at Tr. 48-49, 55-56; J.B. Depo. at Tr. 140.)  At the time of her deposition, J.B. was receiving mental health treatment.  (Blume Depo. at Tr. 56-57.)

In February 2022, J.B. and the Blumes moved to Warren, Ohio and enrolled J.B. in in-person classes at a different school district.  (*Id*. at Tr. 5; J.B. Depo. at Tr. 141.)

## II.    Procedural History

### A.    The Pleadings

On October 1, 2022, Plaintiffs filed a Complaint in this Court against Liberty Local Schools, Mr. Palmer, and Mr. Walker.  (Doc. No. 1.)  Therein, Plaintiffs allege the following three claims against all three defendants: (1) Title IX Violation (Count I); (2) Spoliation (Count II); and (3) Defective Design (Count III).  (*Id*.)  Plaintiffs seek compensatory damages in the amount of $1,500,000, punitive damages in the amount of $750,000,  attorney's fees, costs, and interest.  (*Id.* at PageID#s 9-10.)  Defendants filed their Answer on November 2, 2022.  (Doc. No. 6.)

On November 15, 2022, Liberty Local filed a Motion for Partial Judgment on the Pleadings, seeking dismissal of Plaintiffs' spoliation and defective design claims against it.  (Doc. No. 7.)  On that same date, Walker and Palmer filed a Motion for Judgment on the Pleadings as to all three of Plaintiffs' claims.  (Doc. No. 8.)

12

The Court conducted a Case Management Conference ("CMC") on January 26, 2023. (Doc. No. 15.) Of particular note, the Court set a pleading amendment deadline of March 30, 2023. (*Id*.) The Court also set the following discovery and dispositive motion case management deadlines: (1) fact discovery to be completed by July 26, 2023; (2) expert discovery to be completed by October 27, 2023; and (3) dispositive motions due by November 27, 2023. (*Id*.)

On February 2, 2023, Plaintiffs filed a "Motion for Partial Voluntary Dismissal of Certain Parties and Claims" pursuant to Fed. R. Civ. P. 41(a)(1)(A)(2). (Doc. No. 16.) Specifically, Plaintiffs sought (1) dismissal of Walker and Palmer as to Count I, with prejudice; and (2) dismissal of all Defendants as to Counts II and III, without prejudice. *See* Doc. Nos. 16, 17. Defendants filed a response indicating that they did not oppose Plaintiffs' Motion. (Doc. No. 19.)

On February 15, 2023, the Court granted Plaintiffs' Motion for Partial Voluntary Dismissal, as follows. Count One was dismissed with prejudice as to Walker and Palmer, and Counts Two and Three were dismissed without prejudice as to all three Defendants. (Doc. No. 20.) Thus, the Court denied the pending Motions for Judgment on the Pleadings (Doc. Nos. 7, 8) as moot and noted that "[t]his matter will proceed solely on Count One (Title IX Violation) as to Defendant Liberty Local Schools." (*Id*. at PageID# 105.)

### B. Fact and Expert Discovery

The pleading amendment deadline expired on March 30, 2023. As discovery progressed, the parties requested multiple extensions of the remaining case management deadlines. *See* Doc. Nos. 26, 28, 34, 38, 40, 44. On June 9, 2023, Plaintiffs requested (and were granted) a thirty (30) day extension of the fact discovery deadline. (Doc. No. 26.) In August 2023, the parties jointly moved for a thirty (30) day extension of the discovery and dispositive motions deadlines, which this Court

granted. (Doc. No. 28.) In December 2023, the parties jointly moved for a four month extension of the fact discovery deadline, and a five month extension of both the expert discovery and dispositive motions deadline. (Doc. No. 34.) The Court granted the Motion but cautioned the parties that no further extensions would be granted absent extraordinary circumstances. *See* Non-Doc Order dated Dec. 14, 2023. In February 2024, Plaintiffs moved for yet another extension of the expert discovery and dispositive motions deadlines, on the grounds that J.B. had been hospitalized and was facing various charges in Juvenile Court.[9] (Doc. No. 38.) The Court granted the Motion. *See* Non-Doc Order dated Feb. 8, 2024. On February 8, 2024, Liberty Local filed a Motion seeking an Order allowing its child psychiatric expert to conduct an independent psychological exam of J.B., Blume, and Mrs. Blume. (Doc. No. 39.) Plaintiffs did not oppose the Motion, and the Court granted it on February 26, 2024.

Over the following months, the parties continued to request extensions of the remaining case management deadlines. In March 2024, Plaintiffs requested a thirty (30) day extension of the expert and dispositive motions deadlines. (Doc. No. 40.) The Court granted the Motion. In May 2024, in the sixth request for extension filed in this action, Liberty Local sought a thirty (30) day extension of the expert deadline due to its "expert's workload and other commitments." (Doc. No. 44.) The Court granted the Motion, but noted that it was "losing patience with the parties' inability to timely complete fact and expert discovery" and "warn[ed] counsel for both sides that no further extensions will be granted in this matter under any circumstances." *See* Non-Doc Order dated May 29, 2024.

---

[9] The Court notes that Plaintiffs' former counsel filed unredacted copies of records from J.B.'s juvenile proceedings on the public docket. (Doc. No. 38-1.) These records contained J.B.'s full name, as well as details regarding J.B.'s juvenile court charges and proceedings. (*Id.*) On its own initiative, the Court immediately restricted J.B.'s juvenile records to case participants only. The Court notes, however, that this is yet another example of Plaintiffs' former counsel's failure to exercise the appropriate care and caution regarding his own minor client's privacy.

### C.      Summary Judgment Briefing

The parties filed cross Motions for Summary Judgment on August 30, 2024.  (Doc. Nos. 52, 53.)  Briefs in Opposition were filed on September 30, 2024, to which Replies were filed on October 14 and 15, 2024.  (Doc. Nos. 56, 57, 58, 59.)  Then, on November 14, 2024, Liberty Local filed a "Notice of Supplemental Authority in Support of Summary Judgment," in which it brought the Sixth Circuit's recent decision in *R.L., on behalf of R.S., a minor, v. Knox County, Tennessee*, Case No. 24-5002 (6th Cir. Nov. 6, 2024) to the Court's attention.  (Doc. No. 60.)  Liberty Local's Notice briefly summarized the Sixth Circuit's decision and included one short paragraph of argument applying the *R.L* decision to the instant case.  (*Id*.)

On November 22, 2024, Plaintiffs filed a "Reply" to Liberty Local's Notice.  (Doc. No. 61.)  Plaintiffs' Reply consisted of five (5) pages of wide-ranging argument that included (but was not limited to) a discussion of the potential applicability of the *R.L.* decision to the instant case.  (*Id.*)  In addition, Plaintiffs attached, as "Exhibit A" to their Reply, an unredacted copy of what appears to be one page of D.P.'s juvenile records, and filed it on the public docket.  (Doc. No. 61-1.)  On its own initiative, the Court restricted access to "Exhibit A" (Doc. No. 61-1) to case participants only.

On December 2, 2024, Liberty Local moved to strike Plaintiffs' Reply and "Exhibit A" attached thereto on several grounds, including that (1) the Reply constituted an unauthorized Sur-Reply, and (2) Exhibit A is unauthenticated and was not produced in discovery.  (Doc. No. 62.)  In response, Plaintiffs filed the "Declaration of David L. Engler in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and in support of Plaintiffs' Motion for Summary Judgment."  (Doc. No. 63.)  At that time, Mr. Engler was Plaintiffs' counsel.  In his Declaration, Attorney Engler discusses and authenticates a November 1, 2023 Magistrate's Decision in D.P.'s

15

juvenile court proceedings.  (*Id.*)  An unredacted copy of that Magistrate's Decision is attached as an Exhibit to the Declaration.  (Doc. No. 63-1.)  Once again, and on its own initiative, the Court restricted access to this Exhibit (Doc. No. 63-1) to case participants only.  On December 23, 2024, Liberty Local moved to strike Attorney Engler's Declaration and the Magistrate's Decision attached thereto. (Doc. Nos. 64, 65.)

**D.     Withdrawal of Plaintiffs' Counsel and Filing of Blume's *pro se* Motion to Amend**

Shortly thereafter, on December 31, 2024, Attorney Engler moved to withdraw as counsel for Plaintiffs.  (Doc. No. 66.)  On February 3, 2025, after confirming that Attorney Engler had provided written notice of his intent to withdraw to both his clients and to Liberty Local, the Court granted Attorney Engler's Motion to Withdraw.  *See* Non-Doc. Order dated Feb. 3, 2025.

On March 3, 2025, Blume, now proceeding *pro se*, filed the following documents:  (1) a Motion for Leave to File Amended Complaint or, in the alternative, to Voluntarily Dismiss the Complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) (Doc. No. 69); and (2) the "Declaration of Guy Blume in Opposition to Motions to Strike and in Support of Motion to Amend" (Doc. No. 68.)  In response, Liberty Local filed a Reply Brief in Support of its Motions to Strike (Doc. No. 71) and a Brief in Opposition to Blume's Motion for Leave to Amend or Voluntarily Dismiss (Doc. No. 72.)  On April 7, 2025, Blume filed a *pro se* Reply Brief in support of his Motion to Amend or Voluntarily Dismiss.  (Doc. No. 73.)

**D.     The Court raises concerns regarding J.B.'s lack of representation and appoints pro bono counsel**

On May 22, 2025, the Court issued an Order in which it noted that "the Sixth Circuit has held that non-attorney parents cannot appear *pro se* on behalf of their minor children in lawsuits in federal court," including in the context of Title IX cases.  (Doc. No. 74) (collecting cases).  The Court found

16

that "Plaintiff Blume does not claim or argue that he is a duly licensed attorney who may lawfully assert the claims of his minor child, J.B." and, therefore, "it does not appear that Blume may seek leave to amend to add new claims and defendants on behalf of J.B., or seek to voluntarily dismiss the instant action under Rule 41(a)(2)."  (*Id.*)  The Court set a telephonic status conference for June 5, 2025 "to discuss its concerns regarding the fact that J.B. is currently not represented by counsel." (*Id.*)

During the June 5, 2025 status conference, the Court raised the possibility of appointing *pro bono* counsel but explained that Blume would first need to complete an Affidavit of Need.  Blume thereafter filed an Affidavit of Need on June 12, 2025.  (Doc. No. 75.)  The Court referred the matter to the Clerk's Office *Pro Bono* Department for the appointment of legal counsel.

On June 18, 2025, the Court appointed Attorneys Marisa Darden and Johanes Maliza as *pro bono* counsel for Plaintiffs J.B. and Blume.  The Court then conducted a status conference with Plaintiffs' new counsel and counsel for Defendant on July 23, 2025.  During that conference, the Court ordered that "Plaintiffs shall have until thirty (30) days from the date of this Order to submit (1) a supplement to Plaintiff Guy Blume's *pro se* Motion for Leave to File Amended Complaint or, in the alternative, to Voluntarily Dismiss the Complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) (Doc. No. 69 ); and/or (2) a separate Motion on behalf of Plaintiff J.B."  *See* Non-Doc Order dated July 23, 2025.  The Court further ordered that Defendant shall have fourteen (14) days to respond to any supplement and/or Motion filed by Plaintiffs.  (*Id.*)

On August 22, 2025, Plaintiffs J.B. and Blume, through *pro bono* counsel, filed a Motion to Amend Complaint and supporting Declarations of J.B. and Blume.  (Doc. No. 78.)  Defendant filed

a Brief in Opposition on September 5, 2025, to which Plaintiffs replied on September 12, 2025. (Doc. Nos. 82, 83.)

## III. Standard of Review

As noted above, the pleading amendment deadline in this case expired in March 2023. Seeking leave to amend a pleading after a scheduling order's deadline has passed implicates two Federal Rules of Civil Procedure, Rule 15 and Rule 16. *See Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). Rule 15 provides that "[t]he court should freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 16 requires the district court to enter a scheduling order that includes a 349 deadline for amending pleadings and provides that a court can modify its scheduling order "only for good cause." Fed. R. Civ. P. 16(b)(3)(A) & (4). Interpreting the interplay between these two Rules, the Sixth Circuit has held that, notwithstanding Rule 15's directive to freely give leave to amend, a party seeking leave to amend after the scheduling order's deadline must first meet Rule 16's "good cause" standard in order for the district court to amend the scheduling order. *See Leary*, 349 F.3d at 909; *Armatas v. Haws*, 2021 WL 5356028 at * 3 (6th Cir. 2021); *Carrizo (Utica) LLC v. City of Girard, Ohio*, 661 Fed. Appx. 364, 367 (6th Cir. 2016). *See also Satterwhite v. Ashtabula County Metroparks*, 514 F.Supp.3d 1014, 1021 (N.D. Ohio 2021).

"A court asked to modify a scheduling order for good cause 'may only do so if [a deadline] cannot reasonably be met despite the diligence of the party seeking the extension.'" *Marcilis v. Twp. of Redford*, 693 F.3d 589, 597 (6th Cir. 2012) (quoting *Leary*, 349 F.3d at 906). *See also Helena Agri-Enterprises, LLC v. AAA Turf, Inc.*, 2023 WL 4842838 at * 2 (6th Cir. July 28, 2023). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp*, 281 F.3d 613, 625 (6th

Cir. 2002) (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)). *See also Leary*, 349 F.3d at 907. Possible prejudice to the party opposing modification is another relevant consideration in the good cause analysis. *Inge*, 281 F.3d at 625. *See also Leary*, 349 F.3d at 909; *Carrizo (Utica) LLC.*, 661 Fed. Appx. at 368; *Satterwhite*, 514 F.Supp.3d at 1021-1022. "Notably, the moving party must meet a 'higher threshold' in showing good cause under Rule 16 than it would under Rule 15." *Armatas,* 2021 WL 5356028 at * 3 (citing *Shane v. Bunzl Distrib. USA, Inc.*, 275 Fed. Appx. 535, 536 (6th Cir. 2008)).

If good cause is shown under Rule 16, the court then considers whether amendment is appropriate under Federal Rule of Civil Procedure 15. As noted above, under Rule 15(a)(2), a district court should give leave for a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). "The thrust of Rule 15 is to reinforce the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Teft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982). "Nevertheless, leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" *Carson v. U.S. Office of Special Counsel,* 633 F.3d 487, 495 (6th Cir. 2011) (quoting *Crawford v. Roane,* 53 F.3d 750, 753 (6th Cir. 1995)).

## IV.     Analysis

### A.     Plaintiff Blume's *pro se* Motion to Amend or Voluntarily Dismiss (Doc. No. 69)

The Court first finds that Plaintiff Blume's *pro se* "Motion for Leave to File Amended Complaint or, in the alternative, to Voluntarily Dismiss the Complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2)" (Doc. No. 69), filed in March 2025, is superseded by Plaintiffs' Motion to Amend filed by *pro bono* counsel in August 2025. As noted above, in June 2025, this Court appointed

*pro bono* counsel to represent both J.B. and Blume. *Pro bono* counsel subsequently entered an appearance on behalf of J.B. and Blume (Doc. No. 77) and filed a Motion to Amend (Doc. No. 78) on behalf of both Plaintiffs on August 22, 2025.

In light of the above, the Court concludes that Plaintiffs' August 2025 Motion to Amend (filed by *pro bono* counsel) supersedes and replaces Blume's previous *pro se* Motion for Leave to Amend or to Voluntarily Dismiss the Complaint without prejudice. Blume's *pro se* "Motion for Leave to File Amended Complaint or, in the alternative, to Voluntarily Dismiss the Complaint without prejudice pursuant to Fed. R. Civ. P. 41(a)(2)" (Doc. No. 69) is, therefore, denied on that basis.

The Court will proceed to evaluate Plaintiffs' Motion to Amend Complaint, filed by *pro bono* counsel on August 22, 2025, as well as Liberty Local's Brief in Opposition thereto and Plaintiffs' Reply Brief. (Doc. Nos. 78, 82, 83.)

### B.     Plaintiffs' Motion to Amend Complaint (Doc. No. 78)

In their Motion, Plaintiffs request leave to amend the Complaint to assert a total of sixteen (16) claims against eight (8) named defendants and four (4) John/Jane Doe Defendants. (Doc. No. 78-2.) Specifically, in their proposed Amended Complaint (which is attached as an Exhibit to the Motion), Plaintiffs name the following as defendants: (1) Liberty Board of Education; (2) Mr. Palmer; (3) Mr. Walker; (4) Liberty Local Schools Superintendent Andrew Tommelleo; (5) Ms. Long; (6) (former) Principal Joseph; (7) Liberty Local Schools teacher Todd Smith; (8) D.P., a minor, by and through his representative; and (9) "Jane and John Does Nos. 1-4 as the Parents of D.P., a

minor."[10]  (*Id.*)  Plaintiffs include their existing Title IX claim in the proposed Amended Complaint (Count Two) and seek leave to amend both to expand that claim and to assert entirely new claims for:

(1)    Title VI Race Harassment (against Walker and the LLS Defendants) (Count One);

(2)    Title IX Retaliation (against the LLS Defendants) (Count Three);

(3)    Deliberate Indifference to Sexual Harassment (against the LLS Defendants) (Count Four);

(4)    Denial of Due Process and Equal Protection under 42 U.S. § 1983 (against all Defendants) (Counts Five and Six);

(5)    *Monell* liability for failure to comply with Title IX (against all Defendants) (Count Seven);

(6)    Negligence under Ohio Rev. Code § 3313.666 (against all Defendants) (Count Eight);

(7)    Willful and Wanton Conduct (against all Defendants) (Count Nine);

(8)    Negligent Hiring, Retention, and Supervision (against all Defendants) (Count Ten);

(9)    Intentional Infliction of Emotional Distress (against the LLS Defendants, the Individual Defendants, and D.P.) (Count Eleven);

(10)    Civil Action for Damages for Criminal Acts (against D.P.) (Count Twelve);

(11)    Civil Battery (against D.P.) (Count Thirteen);

(12)    Liability of Parents for Assault by their Child (against D.P.'s parents) (Count Fourteen);

(13)    Loss of Consortium (against all Defendants and D.P.) (Count Fifteen); and

---

[10] In their Proposed Amended Complaint, Plaintiffs refer to Liberty Local Schools and the Liberty Board of Education collectively as the "LLS Defendants."  (Doc. No. 78-2 at PageID# 1299.)  The Court notes, however, that the Proposed Amended Complaint does not name "Liberty Local Schools" as a separate Defendant.  Plaintiffs refer to Palmer, Walker, Tommelleo, Long, Joseph, and Smith, collectively, as "the Individual Defendants."  (*Id.*)

(14)    Declaratory Judgment that Ohio Rev. Code § 2315.18 is Unconstitutional as
        Applied (Count Sixteen).

(Doc. No. 78-2.)

Plaintiffs argue that good cause exists to amend the Complaint to add the proposed new parties

and claims because their failure to do so prior to the March 2023 pleading amendment deadline is not

the fault of J.B. or Blume but, rather, due to the ineffectiveness of Attorney Engler. (Doc. No. 78-1.)

Relying principally on the Sixth Circuit's decision in *Gordon v. England*, 354 Fed. Appx. 975 (6th

Cir. 2009), Plaintiffs argue that amendment is warranted because Attorney Engler failed them at every

stage in the proceedings, beginning with the filing of the original Complaint. (*Id.*) Specifically,

Plaintiffs assert that the original Complaint is "facially deficient" because Attorney Engler only plead

a Title IX claim and two "frivolous claims" for spoliation and defective design which he soon after

voluntarily dismissed, while inexplicably failing to plead "several obvious causes of action and

defendants," such as due process and equal protection claims under 42 U.S.C. § 1983 claims as well

as a host of state law claims. (*Id.*) Plaintiffs maintain that Attorney Engler's decision to only assert

a Title IX claim is particularly egregious because, just prior to the filing of this action, the Supreme

Court held in *Cummings v. Premier Rehab Keller, PLLC,* 596 U.S. 212 (2022) that emotional distress

damages are not available in Title IX cases. (*Id.*)

Plaintiffs argue that there is "no strategic justification" for Attorney Engler's decision to omit

the additional § 1983 and state law claims and to leave Plaintiffs with only one Title IX claim for

which they cannot obtain any relief for their considerable emotional distress. (*Id.*) Moreover, citing

Declarations submitted by both J.B. and Blume, Plaintiffs assert that, in the course of and prior to

drafting the Complaint, Attorney Engler failed to either hold a "fact-finding meeting of any sort" with

J.B. or Blume, or inform them "of the overall strategy, risks, or benefits of the claims that he decided

22

to bring or abandon."  (Declarations of J.B. and Blume (Doc. Nos. 78-3, 78-4.) at PageID#s 1352, 1356.)

Plaintiffs next maintain that Attorney Engler "effectively abandon[ed]" them through his "neglect and ineffectiveness" during both the pleading and discovery stages of proceedings.  (*Id*.) Specifically, Plaintiffs argue that Attorney Engler (1) failed to keep Blume or J.B. informed of developments in the case;  (2) voluntarily dismissed Walker and Palmer without first consulting with Blume or J.B.; (3) failed to inform Blume or J.B. regarding the "overall strategy, risks, or benefits" of the defendants whom he decided to join or dismiss; (4) failed on multiple occasions to timely file materials; (5) failed to show either Blume or J.B. drafts of pleadings and motions prior to filing them on their behalf; and (6) engaged in "rudimentary discovery efforts" that focused on J.B.'s emotional state, even though emotional distress damages are not recoverable under Title IX.  (*Id*.)  *See also* Doc. Nos. 78-3, 78-4.

Plaintiffs next argue that Liberty Local will not suffer significant prejudice from amendment at this time.  (Doc. No. 78-1 at PageID# 1289.)  While acknowledging that adding the proposed new claims will necessitate additional discovery, Plaintiffs assert that "additional expense and inconvenience in defending against new claims is not significant prejudice" under Sixth Circuit authority.  (*Id*.)  Moreover, Plaintiffs assert that the proposed new defendants "will have to defend these new claims anyway" since the statute of limitations against the new defendants has not passed and J.B. and Blume "could, if they wanted, file a separate action against them."  (*Id*.)  Plaintiffs maintain, however, that filing a new action "would run counter to judicial efficiency and further delay justice." (*Id.*) Plaintiffs then argue that justice requires amending the Complaint in this action, particularly in light of the seriousness of their allegations of sexual assault, rape, sexual harassment,

and retaliation.  (*Id.* at PageID#s 1290-1291.)  Plaintiffs further emphasize that their allegations "raise serious public concerns about the Liberty school system and the safety of its students."  (*Id.*)  Lastly, Plaintiffs argue that the proposed new claims are not futile.  (*Id.*)

In response, Liberty Local argues that Plaintiffs should not be granted leave to amend because the pleading amendment deadline in this case expired over two years ago in March 2023, extensive written and deposition discovery has already been completed, and summary judgment motions are pending. (Doc. No. 82.)  Liberty Local first asserts that Plaintiffs have not demonstrated good cause to amend.  (*Id.*)  Liberty Local notes that Plaintiffs do not argue that they were not aware of the additional facts alleged in the proposed Amended Complaint and, instead, rely entirely on alleged deficiencies in Attorney Engler's previous representation.  (*Id.*)  Liberty Local maintains that the record reflects that Attorney Engler did not "abandon" J.B. and Blume, noting that (1) the parties exchanged "substantial paper discovery;" (2) Attorney Engler participated in six fact witness depositions and all three expert depositions; and (3) Attorney Engler timely filed a Motion for Summary Judgment on Plaintiffs' behalf, and timely opposed Liberty Local's cross Motion for Summary Judgment.  (*Id.* at PageID#s 1367-1368.)

Liberty Local next asserts that it will be unduly prejudiced by amendment, arguing that it would be forced to incur significant additional costs if the Court were to allow Plaintiffs to add eight new party Defendants and multiple new claims at this late stage in the proceedings.  (*Id.* at PageID#s 1368-1371.)  Liberty Local emphasizes that the timing of Plaintiffs' request for amendment is particularly prejudicial, given the fact that summary judgment motions are currently ripe and have been pending for some time.  (*Id.*)  Lastly, Liberty Local notes that "Plaintiffs have other remedies

available to them – i.e., file a separate lawsuit or move for a voluntary dismissal without prejudice." (*Id*. at PageID# 1370.)

In their Reply Brief, Plaintiffs insist that Attorney Engler "failed every step of the way by omitting key claims and defendants and failing to keep Plaintiffs properly informed about this case." (Doc. No. 83.) Plaintiffs maintain that the mere fact that Attorney Engler participated in discovery does not mean that he did not abandon them, in light of J.B.'s and Blume's Declarations that Attorney Engler "did not consult them about the claims being brought, the individuals and entities being sued, or the strategy for this case." (*Id*.) Plaintiffs emphasize that they "had no reason to believe that there were other claims they could bring because their counsel did not tell them what he was doing." (*Id*.) Lastly, Plaintiffs argue "simply filing a new lawsuit will not be as simple as Defendant claims," as they "would likely face substantial procedural pushback from the current and new defendants." (*Id*. at PageID# 1376.) Plaintiffs assert that, even assuming they were successful in bringing a new action, "Defendant would have to engage in the same discovery and same claim defenses [in the new action] that it seeks to avoid here." (*Id*. at PageID# 1377.) Plaintiffs argue that "the far more efficient choice—for them, and for this Court—would be to let those claims proceed here and now." (*Id*.)

As noted *supra,* "[t]he primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge,* 281 F.3d at 625. As the Sixth Circuit has explained, parties "can demonstrate 'good cause' for their failure to comply with the original schedule [ ] by showing that despite their diligence they could not meet the original deadline." *Leary*, 349 F.3d at 907. When a party seeks to amend in the late stages of a case, the moving party bears "an increased burden to show justification for failing to move earlier." *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 459 (6th Cir. 2001).

In the instant case, Plaintiffs do not dispute that the Supreme Court's decision in *Cummings, supra*[11] was issued in April 2022; i.e., just over five months before Plaintiffs filed their original Complaint herein, and eleven months before the pleading amendment deadline expired on March 30, 2023.  Notably, it is also undisputed that Plaintiffs were aware of the facts underlying the new claims (as well as the identities of the new defendants) in the proposed Amended Complaint, well prior to the pleading amendment deadline.  Yet Plaintiffs failed to seek leave to amend to add any of the new claims or defendants until Blume first filed his *pro se* Motion for Leave to Amend in March 2025 – nearly two years after the pleading amendment deadline; thirteen months after the expiration of the fact discovery deadline; seven months after the expiration of the expert discovery deadline; and six months after the filing of summary judgment motions.

The Sixth Circuit has repeatedly found that plaintiffs fail to demonstrate good cause where they were aware of the factual bases for their proposed new claims but failed to timely move to amend.  *See, e.g., Leary,* 349 F.3d at 908 (observing that the plaintiffs did not demonstrate good cause where they offered no excuse for their delay in seeking monetary damages, but were "obviously aware of the basis of the claim for many months"); *Commerce Benefits Grp., Inc. v. McKesson Corp.,* 326 Fed. Appx. 369, 376 (6th Cir. 2009) (holding that the plaintiff did not demonstrate good cause where ""the factual basis for the new claims existed at the beginning of the lawsuit"); *Shane,* 275 Fed. Appx. at 537 (holding that the plaintiff did not demonstrate good cause where he knew of the facts

---

[11] In *Cummings*, the Supreme Court found that emotional distress damages are not available for claims brought under certain Spending Clause anti-discrimination statutes.  *Cummings*, 596 U.S. at 222.  "Although Title IX was not specifically at issue in *Cummings*, the decision referred to Title IX as part and parcel of the other Spending Clause statutes with implied private rights of action for which emotional distress damages are not available." *S.C. v. Metropolitan Government of Nashville,* 86 F.4th 707, 718 (6th Cir. 2023) (citing *Cummings,* 596 U.S. at 217-218.)  As the Sixth Circuit has noted, "*Cummings* leaves little doubt that emotional distress damages are no longer permitted for violations of Title IX." *Id*. at 718.

underlying his motion to amend the complaint for "at least six years prior to his motion" and could have pled the allegations he sought to add within the parameters of the court's scheduling order).

Plaintiffs argue that the Court should nonetheless find "good cause" here because the failure to timely amend was due entirely to the alleged misconduct and abandonment of their former counsel, Attorney Engler.  While the Court sympathizes with Plaintiffs, the Court finds this argument to be without merit for the following reasons.

Numerous courts have found that the mistake, inadvertence, and/or neglect of counsel will generally not support a finding of good cause under Rule 16.  *See, e.g., Scott v. New York Department of Corrections,* 445 Fed. Appx. 389, 391 (2nd Cir. 2011) (finding district court did not abuse its discretion in concluding that "the apparent negligence of Scott's former attorney was not sufficient to establish 'good cause' for amending the scheduling order under Rule 16(b)"); *Hussain v. Nicholson*, 435 F.3d 359, 364 (D.C. Cir. 2006) (finding district court did not abuse its discretion by denying plaintiff's motion to amend the scheduling order to reopen discovery even where the plaintiff's former attorney failed to conduct any discovery during the allotted time frame because "a party who voluntarily chooses his attorney 'cannot ... avoid the consequences of the acts or omissions of this freely selected agent' ") (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 633–34 (1962)).  *See also Banks v. City of Philadelphia,* 309 F.R.D. 287, 291-293 (E.D. Pa. 2015) (where plaintiff's previous attorney withdrew and "self-reported to the disciplinary board for his failures in this case," district court denied motions for leave to amend and for additional time to conduct discovery "because the failures of Plaintiff's freely chosen attorney are attributed to Plaintiff, and attorney error does not" justify the modification of a scheduling order or "constitute good cause under Rule 16(b)"); *Malone v. City of Akron, Ohio*,  2024 WL 4198916 at * 3 (N.D. Ohio Sept. 15, 2024) ("Carelessness or

attorney error is insufficient to constitute good cause under Rule 16(b), even when a party was not informed of his attorney's action (or inactions).")"; *Garrison v. Xerox Recovery Services*, 2018 WL 4558201 at * 2 (W.D. Ky. Sept. 21, 2018) (same); *Barnette v. Grizzly Processing, LLC*, 2012 WL 2374400 (E.D. Ky. June 22, 2012) (citing *Hussain, supra* for proposition that plaintiffs are not entitled to a "do over" regarding discovery because of choices made by counsel).[12]

This is because a party who voluntarily chooses his attorney "cannot ... avoid the consequences of the acts or omissions of this freely selected agent." *Link*, 370 U.S. at 633–34. *See also Moore v. U.S. Postal Service*, 369 Fed. Appx. 712, 718 (6th Cir. 2010) ("In our legal system, litigants are generally bound by the acts and representations of their attorneys."); *CrossCountry Mortgage, Inc. v. Messina*, 2019 WL 13195209 at * 3 (N.D. Ohio Oct. 8, 2019) ("Messina chose to be represented by his previous counsel and 'he cannot now avoid the consequences of the acts or omissions of this freely selected agent.'") (quoting *Link*, 370 U.S. at 634).  Moreover, courts have found that a party is "obligat[ed] to monitor and approve [counsel's] proposed strategies and decisions" and that the "failure to do so in the past does not establish good cause now." *Banks*, 309 F.R.D. at 291 (quoting *Marlowe Patent Holdings LLC v. Dice Electronics, LLC,* 293 F.R.D. 688, 701 (D.N.J. 2013)).

---

[12] *See also, e.g., DeVore v. Northwest Florida State College*, 2023 WL 12095069 at * 1 (N.D. Fla. Nov. 17, 2023) (noting that "courts have held the errors or failings of a party's former counsel are not sufficient to meet the good cause standard" under Rule 16) (collecting cases); *Marseet v. Rochester Institute of Technology*, 2023 WL 2377122 at * 4 (W.D.N.Y. 1/27/23), *adopted by* 2023 WL 2374976 (W.D.N.Y. 3/6/23) (finding that "[a]ttorney neglect, carelessness, or oversight is not a sufficient basis for a court to amend a [s]cheduling [o]rder pursuant to Rule 16(b)" and, thus, "the failure of an attorney to recognize a potential cause of action is not a sufficient justification for granting leave to amend a complaint.") (internal citations omitted); *Davidowitz v. Patridge*, 2010 WL 1779279 at *4 (S.D.N.Y. April 23, 2010) (noting that "litigants are generally bound by the professional conduct of the attorneys they choose to represent them, although the conduct of counsel may give rise to a claim for malpractice by the client") (internal quotations omitted).

Here, Plaintiffs argue that Attorney Engler's misconduct went beyond "garden variety" neglect or carelessness and was so egregious that it constitutes "good cause" to amend. In support of this argument, Plaintiffs rely heavily on the Sixth Circuit's decision in *Gordon v. England*, 354 Fed. Appx. 975 (6th Cir. 2009). In *Gordon*, the plaintiff filed EEO complaints against her supervisor alleging racial harassment and reprisal (EEO Complaint I) and sexual harassment (EEO Complaint II). *Gordon,* 354 Fed. Appx. at 977. A final agency decision (FAD) was issued on October 21, 2002 on EEO Complaint I, but plaintiff's then-attorney, J.M. Bailey, failed to file suit in district court until 249 days after the FAD was issued. *Id*. That lawsuit was dismissed without prejudice in November 2003 for failure to provide effective service on Defendants. *Id*. In April 2004, the EEOC dismissed plaintiff's EEO Complaint II because Attorney Bailey indicated that "this action has been filed in Federal Court and will be pursued in Federal Court." *Id.*

In July 2004, plaintiff (through Attorney Bailey) filed a second action in district court raising nearly identical claims as her first lawsuit. *Id*. This lawsuit was dismissed in August 2006 based on a motion for voluntary non-suit filed by Attorney Bailey. *Id.* According to plaintiff, Attorney Bailey had not responded to her requests for information and, further, had not informed her that he had dismissed her case. *Id.* In March 2007, plaintiff, now proceeding *pro se*, filed a third lawsuit in federal court based on the allegations in her EEO Complaints. *Id.* Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). *Id.* The district court granted the motion, finding that dismissal was warranted because plaintiff failed to file suit within 90 days of the FAD. *Id*.

On appeal, the Sixth Circuit remanded with instructions to allow plaintiff leave to amend to include allegations sufficient to make the necessary showing for equitable tolling. *Id*. at 981. The

Sixth Circuit's ruling was based, in large part, on the "extreme malfeasance" of Attorney Bailey.

Specifically, the court explained (in relevant part):

> Despite many attempts by Gordon to litigate these issues, no court or administrative body has ever reached the merits of Gordon's claims.  In large part, this appears to be the result of wholly incompetent legal representation. *** Gordon's attorney was indisputably late with filings in multiple actions, failed to properly effectuate service, and abandoned Gordon's suit for no apparent reason. To compound these errors, Mr. Bailey failed in an attorney's most basic responsibility, that of communicating with his client and keeping her informed of the status of her case.
>
> ***
>
> If Gordon's allegations are correct, her attorney's conduct went well beyond "garden variety" neglect.  He completely failed Gordon every step of the way in his failure to file the proper documents with the courts, in his failure to timely perform his duties, and in his failure to keep Gordon abreast of the status of her case.  Even worse, he aborted an EEO investigation by falsely stating that a Title VII case was proceeding. Then, when he again appeared to be missing deadlines, he filed a voluntary non-suit, effectively aborting Gordon's claim. He took many of these actions without notifying Gordon.  On the limited record before this Court, we do not know exactly what the attorney was telling Gordon, but she states that she repeatedly tried to contact him, and she has diligently pursued this case proceeding *pro se.*
>
> ***
>
> In view of the egregious conduct of Gordon's attorney and her status as a *pro se* litigant, we will remand the case to the district court and allow Gordon an opportunity to amend her initial complaint. When Gordon learned through Defendants' motion to dismiss that her complaint was untimely, her proper recourse was to file an amended complaint that included allegations sufficient to find equitable tolling.  Again, Gordon was proceeding *pro se* and was likely to have been unaware of the requirements of Rule 15 of the Federal Rules of Civil Procedure.  Therefore, Gordon should be permitted an opportunity to amend her complaint to make the necessary showing to satisfy the standards for equitable tolling.

*Id*. at 979, 980, 981.  Lastly, the Sixth Circuit emphasized the seriousness of plaintiff's allegations and the fact that, because of her former attorney's malfeasance, she had been denied the opportunity to have her claims heard on the merits.  *Id*. at 982.

30

The Court finds that *Gordon, supra* is distinguishable from the instant case for several reasons. As an initial matter, *Gordon* did not involve the standard for leave to amend under Rule 16.  Rather, the district court in *Gordon* dismissed plaintiff's *pro se* complaint at the pleading stage and the Sixth Circuit remanded with orders to allow plaintiff leave to amend to assert allegations to support equitable tolling (even though plaintiff had not requested leave to amend.)  Thus, the Sixth Circuit did not examine whether, or find that, alleged malfeasance, neglect, or misconduct by counsel may constitute "good cause" to warrant amendment of a complaint beyond the pleading amendment deadline.  And, as noted *supra*, a number of courts (including several Circuit Courts) have found that attorney error, carelessness, and/or neglect generally does not support a finding of good cause under Rule 16.  *See, e.g., Scott,* 445 Fed. Appx. at 391; *Hussain*, 435 F.3d at 364; *Banks,* 309 F.R.D. at 291-293.

More importantly, the Court finds that Attorney Engler's allegedly deficient misconduct herein does not rise to the level of the "egregious malfeasance" that was present in *Gordon*.  Unlike Attorney Bailey in *Gordon*, Attorney Engler timely filed the instant lawsuit, properly (and timely) served Defendants, and vigorously pursued both fact and expert discovery, including issuing and responding to written discovery, participating in fact and expert depositions,[13] and retaining a Title

---

[13] In their Brief in Opposition, Liberty Local first suggests that Attorney Engler participated in nine depositions, stating: "The parties conducted the depositions of six fact witnesses, the minor Plaintiff, J.B. and her father, Guy Blume. In addition, the parties conducted the discovery depositions of three experts for a total of eleven depositions. Plaintiffs' prior counsel participated in fact discovery, every fact witness deposition, and all three expert depositions prior to his withdraw[al] of counsel on February 3, 2025." (Doc. No. 82 at PageID# 1366.)  Later, however, Liberty Local indicates that: "[P]rior counsel participated in all eleven of the depositions conducted by the parties, including those of the Plaintiffs and the discovery depositions of both of Defendant's expert witnesses." (*Id.* at PageID# 1367-1368.)  The record before this Court does not include the transcripts of all of the depositions in this case.  Upon review of the transcripts that were filed on the docket, the Court notes that Attorney Engler took the depositions of Walker (Doc. No. 49-1), Joseph (Doc. No. 50-1), and Theresa Long (Doc. No. 51-1), but did not defend the depositions of either Blume (Doc. No. 47-1) or J.B. (Doc. No. 48-1).  Regardless, Plaintiffs do not dispute that Attorney Engler participated in numerous depositions in this case. Nor do Plaintiffs argue or aver that Attorney Engler failed to prepare Blume and/or J.B. for their depositions.

IX expert.  Attorney Engler also timely filed a Motion for Summary Judgment on Plaintiffs' behalf, and timely responded to Defendant's Motion for Summary Judgment.

The Court acknowledges Plaintiffs' argument that Attorney Engler (like Attorney Bailey in *Gordon*) failed "in an attorney's most basic responsibility, that of communicating with his client and keeping her informed of the status of her case." *Gordon*, 354 Fed. Appx. at 979, 980, 981. Specifically, Plaintiffs aver that Attorney Engler failed to inform them of the "overall strategy, risks, or benefits" of the claims that "he decided to bring or abandon" or of "the defendants he decided to join or dismiss."  (Doc. Nos. 78-3, 78-4.)  Plaintiffs further aver that Attorney Engler did not show them drafts of pleadings and motions prior to filing them, or inform them of court dates or filing deadlines.  (*Id.*)  In addition, J.B. avers that Attorney Engler failed to inform her of her rights as a victim in D.P.'s juvenile case.  (Doc. No. 78-3.)

Certainly, the averments included in the Declarations of J.B. and Blume are concerning to this Court.  Upon careful consideration, however, the Court finds that Plaintiffs have nonetheless failed to demonstrate good cause under Rule 16(b).  As an initial matter, the lack of communication by Attorney Bailey in *Gordon* is distinguishable in certain respects from Attorney Engler's alleged communication failures in the instant case.  In *Gordon,* the Sixth Circuit noted that the plaintiff repeatedly tried to contact Attorney Bailey in order to monitor her case, but Attorney Bailey failed to return her calls.  *See Gordon*, 354 Fed. Appx. at 977 (noting that Gordon sent a letter to the judge indicating that she had been "unable to reach Mr. Bailey"); 979 (noting Gordon contacted the district court directly "following repeated failures to reach her attorney"); 980 (noting that Gordon asserted that Attorney Bailey "refused to return her repeated phone calls").   In other words, the plaintiff in *Gordon* was diligent in attempting to monitor the status of her case and consult with Attorney Bailey,

but was thwarted by Attorney Bailey's repeated failures to return her phone calls.  By contrast, here, Plaintiff Blume does not aver or argue that he attempted to consult or discuss the instant case with Attorney Engler but was unable to do so due to Attorney Engler's refusal to respond to him (or J.B.). (Doc. Nos. 78-3, 78-4.)  While the Court has sympathy for Plaintiffs' situation, the fact remains that Plaintiff Blume had some responsibility to monitor the instant action, including making inquiries regarding Attorney Engler's proposed strategies and decisions. *See Banks*, 309 F.R.D. at 291. Plaintiff Blume does not aver that he did so.   Nor does Plaintiff Blume explain why he failed, at any time prior to Attorney Engler's withdrawal, to seek a second opinion or change attorneys.

The Court further finds that Liberty Local would be severely prejudiced by allowing amendment at this late stage in the proceedings.  The Sixth Circuit has noted that "'[t]he longer the delay, the less prejudice the opposing party will be required to show.'" *Helena Agri-Enterprises, LLC,* 2023 WL 4842838 at * 3 (quoting *DuBuc v. Green Oak Twp*., 312 F.3d 736, 752 (6th Cir. 2002)).  Even basing the length of the delay on Plaintiff Blume's *pro se* Motion to Amend (rather than on the Motion to Amend filed after the appointment of *pro bono* counsel), that Motion was filed over eleven (11) months after the expiration of the pleading amendment deadline.  The Court finds this to be a significant delay.  *See, e.g., Garza v. Lansing School District*, 972 F.3d 853, 879-880 (6th Cir. 2022) (finding that defendants would suffer prejudice where the plaintiff sought to amend his complaint nine months after the pleading amendment deadline).  Moreover, fact and expert discovery are both closed.  The Court agrees with Liberty Local that the addition of a substantial number of new parties and claims at this late stage in the proceedings will result in additional discovery, further delay, and increased legal expenses.  The Court further finds that Liberty Local would be unduly prejudiced by amendment at this late date given that summary judgment motions are currently ripe

and pending.  *See Church Joint Venture L.P. v. Blasingame*, 947 F.3d 925, 934 (6th Cir. 2020) (noting that "'allowing an amendment after discovery is closed and summary judgment motions are fully briefed imposes significant prejudice on defendants.'") (quoting *Siegner v. Twp. of Salem*, 654 Fed. Appx. 223, 228 (6th Cir. 2016)).[14]

Accordingly, for all the reasons set forth above, Plaintiffs' Motion for Leave to Amend (Doc. No. 78) is denied.

## V.    Conclusion

For all the foregoing reasons, Plaintiff Guy Blume's *pro se* Motion for Leave to File an Amended Complaint or, in the alternative, for Voluntary Dismissal (Doc. No. 69), filed in March 2025, is DENIED on the grounds that it is superseded by Plaintiffs' Motion to Amend Complaint (Doc. No. 78), filed in August 2025.   Plaintiffs' August 2025 Motion to Amend Complaint (Doc. No. 78) is DENIED.  The Court will issue a separate Opinion regarding the pending cross Motions for Summary Judgment (Doc. Nos. 52, 53) and Motions to Strike (Doc. Nos. 62, 64) in due course.

**IT IS SO ORDERED.**


  *s/Pamela A. Barker*
PAMELA A. BARKER
Date: December 19, 2025            U. S. DISTRICT JUDGE

---

[14] The Court notes that Plaintiffs do have other potential remedies to pursue their proposed claims, including (but not limited to) filing a separate lawsuit raising their proposed new claims.  While there may be challenges associated with filing a new lawsuit, the fact remains that there is a potential path open to Plaintiffs to obtain the full scope of relief they seek.