## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

**J.B., a minor, by her**                              **Case No. 4:22CV1752**
**Father and next friend,**
**Guy Blume, et al.,**

                              **Plaintiffs,**          **JUDGE PAMELA A. BARKER**

          **-vs-**

                                                       **MEMORANDUM OPINION & ORDER**

**Liberty Local Schools,**

                              **Defendant.**


  This matter is before the Court on (1) the Motion of Plaintiffs J.B. (a minor, by her Father and next friend, Guy Blume) and Guy Blume (hereinafter referred to collectively as "Plaintiffs") for Summary Judgment on Liability (Doc. No. 52); and (2) Defendant Liberty Local School's (hereinafter referred to as "Defendant" or "Liberty Local") Motion for Summary Judgment (Doc. No. 53).  The parties filed their respective Briefs in Opposition on September 30, 2024, and Reply Briefs were filed on October 14, 2024.  (Doc. Nos. 56, 57, 58, 59.)  Defendant thereafter filed a Notice of Supplemental Authority on November 14, 2024, to which Plaintiffs responded on November 22, 2024.  (Doc. Nos. 60, 61.)

  Also pending are Defendant's Motions to Strike, filed December 2, 2024 and December 23, 2024.  (Doc. Nos. 62, 64.)  Plaintiffs, while represented by counsel, filed a Brief in Opposition to Defendant's first Motion to Strike on December 20, 2024, to which Defendant replied on December 23, 2024.  (Doc. Nos. 63, 65.)  Several months later, on March 3, 2025, Plaintiff Blume (then-proceeding *pro se*) filed a Declaration in Opposition to Defendant's second Motion to Strike, to which Defendant replied on March 10, 2025.  (Doc. Nos. 68, 71.)

For the following reasons, Defendant's Motions to Strike (Doc. Nos. 62, 64) are GRANTED IN PART and DENIED IN PART, as set forth herein. Plaintiffs' Motion for Summary Judgment on Liability (Doc. No. 52) is DENIED, and Defendant's Motion for Summary Judgment (Doc. No. 53) is GRANTED.

## I. Facts

### A. J.B. reports that she was sexually assaulted at Liberty Local Middle School

Plaintiff J.B. moved to Youngstown, Ohio in 2017 to live with her father, Plaintiff Guy Blume (hereinafter "Plaintiff Blume" or "Blume"), and her step-mother, Lynn Blume. (Deposition of J.B. (Doc. No. 48-1) at Tr. 17; Deposition of Guy Blume (Doc. No. 47-1) at Tr. 4-5, 9.) J.B. was nine years old at the time, and was enrolled in the Liberty Local School District as a fourth grader. (J.B. Depo. at Tr. 17, 26.) During her fourth, fifth, and sixth grade years at Liberty Local, J.B. was a good student and received A's and B's in her classes. (*Id*. at Tr. Tr. 27-31; Blume Depo. at Tr. 9.) She recalled receiving only one detention during this time period and did not recall that her parents ever made any complaints to the school. (J.B. Depo. at Tr. 27-31; Blume Depo. at Tr. 10.)

During the 2021-2022 school year, J.B. was twelve (12) years old and in the 7th grade. (J.B. Depo. at Tr. 13, 28.) Grade 7 was located in the Liberty Local Middle School, which is in the same building as Liberty Local High School. (Deposition of D. Walker (Doc. No. 49-1) at Tr. 10.) At all times relevant herein, David Palmer was the Junior High School Principal, and Akesha Joseph was the High School Principal and Title IX Coordinator. (*Id*. at Tr. 21; Deposition of A. Joseph (Doc. No. 50-1) at Tr. 9, 17-18, 21.)

During the summer prior to the beginning of her 7th grade school year, J.B. met a male student, D.P., who was also entering the 7th grade at Liberty Local. (J.B. Depo.at Tr. 74.) They

2

began talking on the phone and "snapping" on Snapchat. (*Id*. at Tr. 74-76.) When school started, D.P. was not in any of J.B.'s classes, but they saw each other every day during lunch and in the hallways between classes. (*Id*. at 79-80.) They also met once at a football game, where they held hands and kissed. (*Id*. at Tr. 81-82) J.B. testified that they were boyfriend and girlfriend but that (prior to the incident discussed below) they had never had sex or talked about sex. (*Id*. at Tr. 81, 88.)

On November 18, 2021, J.B. and D.P. arranged to meet in a second floor school bathroom. (*Id*. at Tr. 91-93.) J.B. testified that they were "trying to figure out somewhere to meet up where they wouldn't get in trouble for being in the hallways." (*Id*. at Tr. 93.) J.B. testified that they wanted to find a place where they could talk and kiss. (*Id.* at Tr. 95-97.) They came up with a plan where another classmate secured the key to the second floor bathroom[1] and then gave the key to D.P. while he was in the in-school suspension (or "ISS") room, which was supervised by intervention specialist David Walker. (*Id*. at Tr. 94-95.) Meanwhile, J.B. was in a nearby study hall, which was supervised by Mr. Palmer. (*Id*. at Tr. 94-95, 98.) When J.B. saw D.P. leave the ISS room to go to the bathroom, J.B. asked to be excused from study hall to get her Chromebook, which she had intentionally left in the cafeteria. (*Id*. at Tr. 98.) J.B. was given permission to get her Chromebook. (*Id*.) She retrieved her Chromebook from the cafeteria and then went to the second floor bathroom. (*Id*.)

The bathroom door was unlocked and D.P. was inside. (*Id*. at Tr. 98-99.) J.B. testified that she and D.P. began kissing. (*Id.* at Tr. 106.) She testified that D.P. tried to pull her pants down and

---

[1] Principal Joseph testified that the second floor bathroom was a student bathroom. She explained that there were periods of time when they would lock the bathroom door and students would need to get a key from a teacher to access the bathroom. (Joseph Depo. at Tr. 37, 85-86.) J.B. testified that the door to this particular bathroom was typically locked, and that the only time it was unlocked was when a student in the in-school suspension room was able to get the key from Mr. Walker. (J.B. Depo. at Tr. 72-73.)

3

grabbed her hips.  (*Id*.)  J.B. stated that she told D.P. to please stop because he was hurting her, but "he said he doesn't care."  (*Id*.)  J.B. testified that she screamed loudly but nobody was in the hallway at the time.  (*Id*. at Tr. 107-108.)  She further testified that she tried to leave the bathroom, but D.P. grabbed her, flipped her over, and raped her.  (*Id*. at Tr. 106.)  During her deposition, J.B. stated repeatedly that, while the initial kissing was consensual, she did not consent to having sex with D.P. (*Id*. at Tr. 104, 109-110.)

After D.P. left, J.B. found her clothes and got dressed.  (*Id*. at Tr. 110-111.)  Her underwear was bloody and her leg was bruised.  (*Id*. at Tr. 111, 117.)  She was upset and crying.  (*Id*. at Tr. 111, 113.)  J.B. returned to study hall, where she continued to cry.  (*Id*.)  She estimated that, by the time she returned to study hall, she had been gone for about 30 minutes.  (*Id*. at Tr. 108, 110.)  Mr. Palmer gave her tissues and asked if she was okay.  (*Id*. at 111, 113.)  J.B. said that she was.  (*Id*.)  She testified that, at that time, she did not feel ready to tell Mr. Palmer (or any teacher) about what had happened in the school bathroom.  (*Id*. at Tr. 112-113.)  J.B. went to gymnastics after school and noticed "a lot of blood."  (*Id*. at Tr. 115.)  She did not tell anyone at gymnastics about what had happened in the school bathroom, nor did she tell her father and/or stepmother.  (*Id*. at Tr. 115-116.)

J.B. did, however, tell her friends.  (*Id*. at Tr. 112, 123.)  Over the next several days, her friends told other students and "that's when the sides began."  (*Id*. at Tr. 113.)  Specifically, J.B's friends told her that "rumors were going around" and that some people were saying that she was raped while others were saying that she was lying and that she had "wanted it."  (*Id*. at Tr. 123-124.)  One of J.B.'s friends encouraged her to tell a teacher.  (*Id*. at 124.)

On December 2, 2021, J.B. took her friend's advice.  (*Id*. at Tr. 119, 124.)  J.B. and her friend approached J.B.'s English teacher, Todd Smith.  (*Id*. at Tr. 124; Deposition of Teresa Long (Doc. No.

51-1) at Tr. 12.)  Mr. Smith then called educational assistant, Teresa Long, and asked Ms. Long to take J.B. to talk to Mr. Walker.  (Long Depo. at Tr. 12; J.B. Depo. at Tr. 124-125.)  J.B. reported to Mr. Walker and Ms. Long that D. P. had raped her in the school bathroom.  (Long Depo. at Tr. 14; Walker Depo. at Tr. 19-20; J.B. Depo. at Tr. 125-126.)  Ms. Long also testified that J.B. indicated that "maybe other students had found out about it, and that made her feel ... uncomfortable, that other students had learned about it."  (Long Depo. at Tr. 14.)  J.B. was tearful and crying.  (*Id.*)  Mr. Walker and Ms. Long determined that this was "above their pay grade" and attempted to reach Junior High School Principal Palmer.  (*Id*. at Tr. 15-16; Walker Depo. at Tr. 14-16.)  Principal Palmer was not in the building, however, so they called High School Principal (and Title IX Coordinator) Akesha Joseph.  (Long Depo. at Tr. 15-16; Walker Depo. at Tr. 20-21.)

Mr. Walker advised Principal Joseph that "they had a student who alleged she had been sexually assaulted" and asked her what they should do.  (Walker Depo. at Tr. 22; Joseph Depo. at Tr. 21-22.)  Principal Joseph told them to keep J.B. away from other students until she (Joseph) was ready to speak to J.B.  (Walker Depo. at Tr. 22.)  Principal Joseph then called Plaintiff Blume and asked him and Mrs. Blume to come to the school.  (Joseph Depo. at Tr. 25.)  Principal Joseph testified that she also called the School Resource Officer and the Superintendent.  (*Id*.)  She then asked Ms. Long to bring J.B. to Joseph's office.  (*Id*. at Tr. 25-26; Long Depo. at Tr. 16.)

### B.    December 2, 2021 Meeting with Principal Joseph

Ms. Long escorted J.B. to Principal Joseph's office,[2] and Plaintiff Blume and Mrs. Blume arrived shortly thereafter.  (J.B. Depo. at Tr. 126-127; Long Depo. at Tr. 16.)  Principal Joseph began

---

[2] Principal Joseph testified that Ms. Long provided Joseph "a synopsis of what had taken place."  (Joseph Depo. at Tr. 24-25.)

5

by advising the Blumes that J.B. had reported that she had been raped in the school bathroom.[3] (Blume Depo. at Tr. 29; Joseph Depo. at Tr. 26, 28.)  Plaintiff Blume was "taken aback" and both parents were "visibly upset."  (Joseph Depo. at Tr. 28.)  According to Principal Joseph, the Blumes began asking J.B. questions about who the boy was and what exactly had happened.  (*Id.* at Tr. 26.) J.B. tried to answer the questions but started to "get a little overwhelmed" and "really emotional." (*Id*. at Tr. 26, 28.)

Principal Joseph then discussed the next steps that Liberty Local would be taking to address the situation.  The record reflects that the parties have different recollections regarding exactly what Principal Joseph said in this regard.  According to Blume and J.B., Principal Joseph advised them that (1) D.P. would be removed from the school; (2) J.B. would be "protected;" and (3) Liberty Local would "fully investigate" the situation.  (Blume Depo. at Tr. 30-31; J.B. Depo. at Tr. 127-128.)  J.B. further testified that Principal Joseph indicated she would notify both the Liberty Local Police Department[4] and Children's Protective Services.  (J.B. Depo. at Tr. 128.)  Blume testified that Principal Joseph also indicated that the Blumes would receive a "Title IX letter" and offered to make counseling services available for J.B.  (Blume Depo. at Tr. 31.)

Principal Joseph testified that she notified J.B. and the Blumes that she would conduct an "objective investigation of the situation."  (Joseph Depo. at Tr. 29.)  Because J.B. was not certain of the exact date on which the incident had occurred, Principal Joseph stated that she would try to gather

---

[3] It is unclear from the deposition testimony whether, during this meeting on December 2, 2021, J.B. also reported to Principal Joseph that other students were spreading rumors and/or making comments to her about the incident.

[4] J.B. and Principal Joseph testified that a school resource officer was present during the December 2, 2021 meeting in Principal Joseph's office, and that this officer was a member of the Liberty Police Department.  (Joseph Depo. at Tr. 29, 41; J.B. Depo. at Tr. 136.)  Blume testified that there was not a school resource officer present during the December 2, 2021 meeting.  (Blume Depo. at Tr. 29.)

6

details that would help her "narrow down a timeline," including examining school records, talking to teachers and staff, and attempting to find security camera footage in the vicinity of the second floor bathroom.  (*Id*. at Tr. 26-27, 29, 31.)  Principal Joseph also advised J.B. and the Blumes that she would need to speak with D.P. and take his statement.  (*Id*. at Tr. 29.)  Principal Joseph explained that, because J.B. was alleging that a crime had been committed, the school would need to report the matter to the police[5] and to Children's Services.  (*Id*.)  Principal Joseph testified that she made sure to advise J.B. and the Blumes that Liberty Local had counselors and "some auxiliary services through different agencies that … would just support [J.B.], talk to her, you know, check in with her … throughout the process."  (*Id*. at Tr. 30, 48.)

According to Principal Joseph, she then advised that, in a situation such as this, Liberty Local "usually employ[ed] strict measures to protect both students."  (*Id*. at Tr. 31.)  She testified that she informed J.B. and the Blumes that she would ask D.P. to come in with his mom the next day to "get their statement and then that way we know how we need to proceed to get through the school day." (*Id*.)  Principal Joseph stated that she assured J.B. and the Blumes that she would make sure J.B. and D.P. did not have any classes together.  (*Id*.)  She also advised that she "would put the teachers on alert," i.e., that she would instruct teachers to "keep an eye out" in the hallways and make sure that J.B. and D.P. have "no contact."  (*Id*. at Tr. 31, 34, 47-48.)  Lastly, Principal Joseph advised Blume that she would do a "full objective investigation" and would "report back to him as [she] found out information."  (*Id.* at Tr. 31.)

---

[5] Principal Joseph testified that the school resource officer was a Liberty police officer; he was present during the meeting; and he was "taking down … [a] statement of what was being said" during that meeting.  (Joseph Depo. at Tr. 29, 41.)

After her meeting with J.B. and the Blumes, Principal Joseph notified Children's Services and Junior High School Principal Palmer.  (*Id.* at Tr. 33, 50.)  She also reached out to the school counselor and confirmed that J.B. and D.P. had no classes together.  (*Id.* at Tr. 34.)  Principal Joseph alerted the teachers that "there is an allegation that's being made between these two students" and that teachers should be "on vigorous watch" to ensure that there is "no contact" between J.B. and D.P.  (*Id.*)  Finally, Principal Joseph called D.P.'s mother and advised her that she and D.P. needed to come to the school the following day.  (*Id.* at Tr. 33.)

On December 3, 2021, Principal Joseph met with D.P. and his mother.  (*Id.* at Tr. 33.)  D.P. denied sexually assaulting J.B.  (*Id.*)  According to Principal Joseph, "his story was pretty much the opposite of" J.B.'s.  (*Id.*)  Principal Joseph advised D.P. and his mother that the school "would have to do a full objective investigation of the situation to try to determine what happened."  (*Id.*)  In addition, Principal Joseph told D.P. that he was under "strict orders" to have "zero contact" with J.B.  (*Id.* at Tr. 34, 50.)  Specifically, Principal Joseph testified that she told D.P. that he was not to make eye contact with J.B. or make any gestures or references towards her and that, "if [he] saw [J.B.] coming, [he was to] walk the other way."  (*Id.* at Tr. 50.)  She also testified that she advised D.P. that there was to be "no social media, no posts, no emails, no tell a friend, none of that" regarding the situation with J.B.  (*Id.* at Tr. 34, 50.)

Principal Joseph testified that, at the time of the investigation, she did not believe that Liberty Local's Title IX policy was "triggered" by J.B.'s complaint because "there was no alleged discrimination or anything at the time or alleged throughout the investigation" and "no allegations of … unequal or unfair treatment."  (*Id.* at Tr. 59-62.)  Rather, she believed that J.B.'s complaint was a complaint that a crime (i.e., sexual assault) had been committed.  (*Id.* at Tr. 58-59, 61, 67.)

8

### C.   J.B. continues to encounter D.P. at school, is harassed by other students, and enrolls in online instruction

J.B. returned to school on Friday, December 3, 2021 and Monday, December 6, 2021.[6]  (J.B. Depo. at Tr. 131.)  It is undisputed that D.P. was in school on both of those days.  J.B. testified that, on both days, she saw D.P. in the hallway and during the lunch period.  (*Id.* at Tr. 129-131.)  Indeed, J.B. testified that, on at least one of those days, D.P. sat at J.B.'s lunch table, despite the fact that the teachers were supposed to be "on alert" and D.P. was under "strict orders" to have "no contact" with J.B.  (*Id.* at Tr. 131.)  J.B. also testified that, on both days, she was harassed by D.P.'s friends in the hallway and bathroom.  (*Id.* at Tr. 132-135.)  Specifically, J.B. testified that D.P.'s friends called her a liar and said that J.B. had led D.P. on and that she "wanted it."  (*Id.* at Tr. 133.)  J.B. also stated that D.P.'s new girlfriend wanted to fight her.  (*Id.*)  J.B. testified that she told Mr. Walker that D.P.'s friends were harassing her, to which he allegedly replied: "just don't go to the bathroom anymore."[7] (*Id.* at Tr. 134-135.)

Blume testified that, on J.B.'s first day back at school (i.e., on Friday, December 3, 2021), J.B. called home and was upset and "miserably shaken" because D.P. was still at school and "people were taking sides."  (Blume Depo. at Tr. 32-33, 41-42.)  J.B. told Blume that she was being treated differently and that the teachers were "hugging D.P." in the hallway.  (*Id.* at Tr. 33-35.)  She also

---

[6] As noted above, J.B. reported the incident to Principal Joseph on Thursday, December 2, 2021.  J.B. and Blume testified that J.B. thereafter returned to Liberty Local on the next two school days, which would be Friday, December 3, 2021 and Monday, December 6, 2021.  During deposition, however, the parties referred to the second day that J.B. returned to Liberty after reporting the rape, as December 4, 2021.  But December 4, 2021 is a Saturday.  Thus, the Court construes J.B. and Blume's testimony as indicating that the two days that J.B. returned to Liberty Local after reporting the rape, were (1) Friday, December 3, 2021 and (2) Monday, December 6, 2021.

[7] It is not clear from the deposition testimony whether J.B. had this conversation with Mr. Walker on Friday, December 3, 2021 or Monday, December 6, 2021.

told Blume that there were girls threatening to fight her, and that she did not feel safe in school.  (*Id*.)
Blume contacted the school counselor but "nobody reached back" to him.  (*Id*. at Tr. 37.)

Blume testified that, on J.B.'s second day back at school (i.e., on Monday, December 6, 2021),
Mr. Palmer called to advise him that "a lot of kids [were] fighting with [J.B.] about what's happened."
(*Id*. at Tr. 43-44.)  According to Blume, Mr. Palmer stated that he was concerned for J.B.'s safety.
(*Id*. at Tr. 43.)  Blume immediately came to the school to pick up J.B.  (*Id*. at Tr. 43-44.)  When he
arrived, Mr. Palmer allegedly told Blume that "they didn't know how they could keep things under
control at this school" and that he (i.e., Mr. Palmer) did not know "if they can keep [J.B.] safe." [8] (*Id*.
at Tr. 44-45.)  According to Blume, both Mr. Palmer and Principal Joseph told him that "it might be
a good idea" to remove J.B. from the school.[9]  (*Id*. at Tr. 45-46.)

Blume then immediately cleaned out J.B.'s locker and removed her from the school.  (*Id*. at
Tr. 45-47.)  He testified that he "had no choice" because "my kid was in danger there."  (*Id*. at Tr.
46.)  He further testified that Liberty Local "did absolutely nothing to help J.B.;" "nobody had control
over the kids" at the Middle School; and that J.B. was not going to be able to get an education at

---

[8] Blume testified that he spoke with Mr. Palmer on both the first and second days that J.B. returned to school (i.e., on both
Friday, December 3, 2021 and Monday, December 6, 2021).  (Blume Depo. at Tr. 36-37.)  It is not clear from the evidence
before this Court what Blume and Mr. Palmer discussed during their conversation on Friday, December 3, 2021.  Blume
also testified that he spoke with Principal Joseph on either one or both of the days that J.B. returned to school after
reporting that she had been sexually assaulted by D.P.  (Blume Depo. at Tr. 37-39; Joseph Depo. at Tr. 35-37, 52-54.)
Principal Joseph testified that she spoke to Blume on one or both both dates and that, during these conversation(s), she
provided updated information to Blume regarding the status of her investigation,  "checked on the status of J.B.," and
reminded him of the counseling services that had been offered.  (Joseph Depo. at Tr. 52-54.)  Blume testified that he
received a call from Principal Joseph after J.B. returned to school, during which Principal Joseph discussed counseling
and indicated that the Blumes "would be getting Title IX paperwork."  (Blume Depo. at Tr. 38-39.) Blume also testified
that Principal Joseph said she had located a videotape that showed "exactly how long the kids were left out of study hall"
on the day in question.  (*Id*.)  Principal Joseph disputed this, testifying that "there was no video."  (Joseph Depo. at Tr.
101-102.) It is not clear from the evidence currently before this Court whether, during his conversation(s) with Principal
Joseph, Blume discussed J.B.'s reports of being harassed and threatened by her peers in the hallways.

[9] Principal Joseph implicitly disputed Mr. Blume's testimony on this point when she testified that she was "shocked" to
learn that J.B. was no longer attending in-person classes at Liberty Local.  (Joseph Depo. at Tr. 55.)

10

Liberty Local under the circumstances.  (*Id.* at Tr. 35-36.)  Blume enrolled J.B. in Liberty Local's remote learning program, which she participated in until transferring to a different school district later during the 7th grade school year.  (*Id*. at Tr. 46.)

### D.    Continued Investigation and Aftermath of November 2021 Incident

Meanwhile, Principal Joseph continued her investigation. Principal Joseph first spent considerable effort trying to narrow down when the incident occurred.  (Joseph Depo. at Tr. 35-37.) Using school records of when D.P. was in the ISS room, she narrowed it down to a particular week in November 2021.  (*Id*.)  Principal Joseph then attempted to access security footage from that particular week, but was unable to retrieve it.  (*Id*.)  She contacted the school technology coordinator, who investigated and informed her that the footage was unavailable because the security cameras only stored footage for the previous twelve (12) days.  (*Id*. at Tr. 36.)  Principal Joseph testified that she called Blume and advised him that the footage did not go back far enough to capture the incident.[10]  (*Id*. at Tr. 37.)

Principal Joseph then talked to an unidentified teacher, who explained about the locked second floor bathroom and the key.  (*Id*. at Tr. 38.)  She also talked to various teachers that were "in the area" to see if they recalled any days when J.B. came back to class "and maybe was a little distraught."  (*Id*. at Tr. 38-39.)  Principal Joseph was unable to draw any kind of definitive conclusion about what had happened based on her investigation, so she reached out to the school resource officer, Sergeant Shuster with the Liberty Police Department, and Children's Services "to see if they had gathered

_____

[10] By contrast, Blume testified that Principal Joseph called him on December 3, 2021 and told him that she knew exactly how long J.B. and D.P. were out of class because "there was a tape." (Blume Depo. at Tr. 38-39.)  Principal Joseph expressly denied saying this, testifying that "there was no video."  (Joseph Depo. at Tr. 101-102.)

11

anything that could be helpful to us in our investigation." (*Id*. at Tr. 39-41.) Principal Joseph testified that, at that point, her investigation "hit a little bit of a dead end." (*Id*. at Tr. 40.)

Once J.B. left the Liberty Local School District, Principal Joseph "never got any additional information." (*Id*.) Principal Joseph never wrote a final investigation report because, from her perspective, the investigation had not concluded. (*Id*. at Tr. 41-42.) She testified that the investigation was still open when she took medical leave from Liberty Local in October 2022. (*Id*. at Tr. 42-44, 90.)

During the week following the meeting with Principal Joseph, J.B. went to the Akron Children's Rape Crisis Center for a rape assessment. (J.B. Depo. at Tr. 129, 137; Blume Depo. at Tr. 51.) J.B. also spoke to the police several times and to Children's Services. (J.B. Depo. at Tr. 137-138.) Blume testified that, after the incident, J.B.'s "mental health went downhill." (Blume Depo. at Tr. 48.) He stated that J.B.'s eating disorder worsened, and that she attempted to harm herself. (*Id*. at Tr. 48-49, 55-56; J.B. Depo. at Tr. 140.) At the time of her deposition, J.B. was receiving mental health treatment. (Blume Depo. at Tr. 56-57.)

In February 2022, J.B. and the Blumes moved to Warren, Ohio and enrolled J.B. in in-person classes at a different school district. (*Id*. at Tr. 5; J.B. Depo. at Tr. 141.)

## II.    Relevant Procedural History[11]

On October 1, 2022, Plaintiffs filed a Complaint in this Court against Liberty Local Schools, Mr. Palmer, and Mr. Walker. (Doc. No. 1.) Therein, Plaintiffs allege the following three claims against all three defendants: (1) Title IX Violation (Count I); (2) Spoliation (Count II); and (3)

---

[11] The procedural history of this matter is set forth at length in this Court's December 19, 2025 Memorandum Opinion and Order denying Plaintiffs' Motion to Amend Complaint (Doc. No. 85), and will not be repeated herein. The Court will only set forth herein the procedural history that is relevant to the instant Motions.

Defective Design (Count III). (*Id*.) Plaintiffs seek compensatory damages in the amount of $1,500,000, punitive damages in the amount of $750,000, attorney's fees, costs, and interest. (*Id.* at PageID#s 9-10.) Defendants filed their Answer on November 2, 2022. (Doc. No. 6.)

On February 2, 2023, Plaintiffs filed a "Motion for Partial Voluntary Dismissal of Certain Parties and Claims" pursuant to Fed. R. Civ. P. 41(a)(1)(A)(2), which Defendants did not oppose. (Doc. No. 16.) The Court subsequently granted Plaintiffs' Motion for Partial Voluntary Dismissal, as follows. Count One (Title IX Violation) was dismissed with prejudice as to Walker and Palmer, and Counts Two and Three (Spoliation and Defective Design) were dismissed without prejudice as to all three Defendants. (Doc. No. 20.) Thus, the Court noted that "[t]his matter will proceed solely on Count One (Title IX Violation) as to Defendant Liberty Local Schools." (*Id*. at PageID# 105.)

After multiple extensions, fact and expert discovery concluded by July 2024 and the parties filed cross Motions for Summary Judgment on Plaintiff's Title IX claim on August 30, 2024. (Doc. Nos. 52, 53.) Briefs in Opposition were filed on September 30, 2024, to which Replies were filed on October 14 and 15, 2024. (Doc. Nos. 56, 57, 58, 59.)

On November 14, 2024, Liberty Local filed a Notice of Supplemental Authority, in which it brought the Sixth Circuit's recent decision in *R.L., on behalf of R.S., a minor, v. Knox County, Tennessee*, 2024 WL 4695966 (6th Cir. Nov. 6, 2024) to the Court's attention. (Doc. No. 60.) On November 22, 2024, Plaintiffs filed a Reply to Liberty Local's Notice, which attached as "Exhibit A" an unredacted copy of what appears to be one page of an October 30, 2023 Magistrate's Decision in D.P.'s juvenile court proceedings.[12] (Doc. No. 61.) Liberty Local moved to strike Plaintiffs' Reply

---

[12] Plaintiffs' then-counsel, Attorney David Engler, filed an unredacted copy of "Exhibit A" to Plaintiffs' Reply on the public docket. On its own initiative, the Court restricted access to "Exhibit A" (Doc. No. 61-1) to case participants only.

and "Exhibit A" attached thereto on various grounds.  (Doc. No. 62.)  Plaintiffs then filed a document captioned "Declaration of [Attorney] David L. Engler in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and in support of Plaintiffs' Motion for Summary Judgment" (Doc. No. 63.) This Declaration attached and purported to authenticate two pages of the October 30, 2023 Magistrate Decision in D.P.'s juvenile court proceedings. (Doc. No. 63-1.)  On December 23, 2024, Liberty Local moved to strike Attorney Engler's Declaration and the two-paged copy of the October 30, 2023 Magistrate Decision attached thereto.  (Doc. Nos. 64, 65.)

Shortly thereafter, on December 31, 2024, Attorney Engler moved to withdraw as counsel for Plaintiffs.  (Doc. No. 66.)  On February 3, 2025, after confirming that Attorney Engler had provided written notice of his intent to withdraw to both his clients and to Liberty Local, the Court granted Attorney Engler's Motion to Withdraw.  *See* Non-Doc. Order dated Feb. 3, 2025.  On March 3, 2025, Plaintiff Blume, proceeding *pro se*, filed a "Declaration [] in Opposition to Motions to Strike," to which Liberty Local replied on March 10, 2025.[13]  (Doc. Nos. 68, 71.)

## III.    Motions to Strike (Doc. Nos. 62, 64)

---

[13] On that same date, Plaintiff Blume also filed a *pro se* Motion for Leave to File Amended Complaint or, in the Alternative, to Voluntarily Dismiss the Complaint without prejudice pursuant to Rule 41(a)(2).  (Doc. No. 69.)  Liberty Local filed a Brief in Opposition (Doc. No. 72), to which Blume filed a *pro se* Reply (Doc. No. 73.)  In May 2025, this Court issued an Order noting that "the Sixth Circuit has held that non-attorney parents cannot appear *pro se* on behalf of their minor children in lawsuits in federal court," including in the context of Title IX cases.  (Doc. No. 74.)  The Court conducted a status conference on June 5, 2025 to "discuss its concerns regarding the fact that J.B. is currently not represented by counsel." (*Id.*)  Thereafter, on June 18, 2025, the Court appointed Attorneys Marisa Darden and Johanes Maliza as *pro bono* counsel for Plaintiffs J.B. and Blume.  On August 22, 2025, Plaintiffs J.B. and Blume, through *pro bono* counsel, filed a Motion to Amend Complaint and supporting Declarations of J.B. and Blume. (Doc. No. 78.)  Defendant filed a Brief in Opposition on September 5, 2025, to which Plaintiffs replied on September 12, 2025. (Doc. Nos. 82, 83.)  On December 19, 2025, the Court issued a Memorandum Opinion & Order (1) denying Plaintiff Blume's *pro se* Motion for Leave to Amend  on the grounds that it is superseded by Plaintiffs' Motion to Amend filed by *pro bono* counsel; and (2) denying Plaintiffs' Motion to Amend filed by *pro bono* counsel.  (Doc. No. 85.)

The Court will first consider Liberty Local's request to strike Plaintiffs' Reply Brief that was filed in response to Liberty Local's Notice of Supplemental Authority.  Next, and because they raise related issues, the Court will consider Liberty Local's requests to strike (1) the partial, one-page copy of the October 30, 2023 Magistrate's Decision that is attached as Exhibit A to Plaintiffs' Reply (Doc. No. 61-1); (2) the two-paged copy of the October 30, 2023 Magistrate's Decision that is attached as an Exhibit to Attorney Engler's Declaration (Doc. No. 63-1); and (3) Attorney Engler's Declaration itself.  (Doc. No. 63.)

> **A.**   **Request to Strike Plaintiffs' Reply (Doc. No. 61) to Liberty's Notice of Supplemental Authority**

Liberty Local first asks the Court to strike Plaintiffs' Reply to Liberty Local's Notice of Supplemental Authority because it (i.e., the Reply) "goes far beyond the scope of the supplemental authority presented to the Court."  (Doc. No. 62 at PageID# 1132.)  Specifically, Liberty Local argues that Plaintiffs' Reply should be stricken from the record because it "spends four pages rehashing [Plaintiffs'] prior arguments, re-citing cases from their prior briefs, [and] making false representations of fact without any citation to the record." (*Id*. at PageID# 1131.)

As Liberty Local correctly notes, a notice of supplemental authority "should be used sparingly and for new, controlling case law—not for recently discovered case law, nor for arguments which the parties did not think to make [earlier]."  *General Elec. Co. v. Latin Am. Imports, S.A*., 187 F. Supp.2d 749, 752, fn 1 (W.D. Ky. 2001).  *See also Buddenberg v. Estate of Weisdack*, 711 F.Supp.3d 712, 762 (N.D. Ohio 2024).  Here, Liberty Local properly used its "Notice" to bring the Sixth Circuit's decision in *R.L., on behalf of R.S., a minor, v. Knox County, Tennessee*, 2024 WL 4695966 (6th Cir. Nov. 6, 2024) to this Court's attention, because that decision was issued several weeks after the parties had filed their respective Reply Briefs in support of Summary Judgment.  The Court does

note, however, that Liberty Local's Notice not only identifies the Sixth Circuit's decision in *R.L.*, but also includes a brief discussion of that case as well as an application of *R.L.* to the instant case.  (Doc. No. 60.)

Because Liberty Local's "Notice" includes legal argument, the Court will consider Plaintiffs' "Reply" to the extent it specifically addresses the applicability of *R.L.* to the instant case.  Based on this Court's review, this is limited to the first two full paragraphs of Plaintiffs' "Reply," i.e., Doc. No. 61 at PageID#s 1122-1123.  The Court will not, however, consider the remainder of Plaintiffs' "Reply" because it does not directly address the *R.L.* decision and, instead, improperly rehashes arguments made in Plaintiffs' summary judgment briefing.  For example, Plaintiffs discuss the Sixth Circuit's decisions in *Kollaritsch v. Mich. State Univ.*, 944 F.3d 613 (6th Cir. 2019) and *S.C. v. Metropolitan Government of Nashville & Davidson County*, 86 F.4th 707 (6th Cir. 2023), both of which were issued well before the parties filed their respective summary judgment briefing.  This goes beyond the scope of Liberty Local's Notice of Supplemental Authority and is, in essence, an unauthorized sur-reply that was filed without leave of Court.  *See Eberhard v. Chicago Title Ins. Co.*, 2014 WL 12756822 at *2 (N.D. Ohio Jan. 8, 2014) (noting that sur-replies are not authorized by either the Federal Rules of Civil Procedure or the Local Rules and "that to file a sur-reply the party must obtain leave of the court."); *West Bend Mutual Ins. Co. v. Osmic, Inc.*, 2024 WL 2784341 at * 4 (N.D. Ohio May 30, 2024) (same).

However, the Court does not find it necessary to strike those portions of Plaintiffs' Reply that do not directly discuss the *R.L.* decision.  District courts "generally look with disfavor on Motions to Strike," *Bell v. Providence Cmty. Corr., Inc.,* 2011 WL 2218600 at *7 (M.D. Tenn. June 7, 2011), primarily because the specific authority to strike documents is found in Fed. R. Civ. P. 12(f), which

permits such action only with respect to a "a pleading [containing] an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Although the Court possesses inherent authority to control its own docket, including to strike matters as appropriate, the Court will nevertheless construe Liberty Local's Motion  as a request to disregard Plaintiffs' "Reply" and grants it to the extent Plaintiffs' "Reply" does not directly discuss the *R.L.* decision. *See In re Caterpillar Inc.*, 2020 WL 1923227 at * 7 (M.D. Tenn. April 21, 2020).

**B.     Request to Strike D.P.'s Juvenile Records and Attorney Engler's Declaration**

The Court next considers Liberty Local's Motions to Strike (1) Attorney Engler's Declaration; and (2) the copies of the October 30, 2023 Magistrate's Decision in D.P.'s juvenile court proceedings (Doc. Nos. 61-1, 63-1) that are attached to Plaintiffs' Reply and to Attorney Engler's Declaration. In its first Motion to Strike, Liberty Local maintains that the one-page copy of the October 30, 2023 Magistrate's Decision that is attached as Exhibit A to Plaintiff's Reply (Doc. No. 61-1) should be stricken because it was not produced in discovery.  (Doc. No. 62-1 at PageID# 1132.)  Liberty Local argues that this is particularly problematic because "juvenile court orders and records (like Exhibit 'A') are not public records and are not readily available to the Defendant." (*Id.*)  Liberty Local next maintains that "Exhibit A" to Plaintiffs' Reply should be disregarded because it is incomplete and "not authenticated or certified by any records custodian" and, further, because "Plaintiffs fail to provide any docket or other evidence providing context as to whether or not the order was appealed and remains valid." (*Id*. at PageID#s 1133-1134.)

In response, Plaintiffs filed Attorney Engler's Declaration, which attaches and purports to authenticate a complete, two-paged copy of the October 30, 2023 Magistrate's Decision.  (Doc. No. 63, 63-1.)  Notably, Plaintiffs do not, at any point in Attorney Engler's Declaration, dispute Liberty

Local's contention that Plaintiffs failed to produce D.P.'s juvenile records in discovery.  (Doc. No. 63.)  Nor do Plaintiffs dispute Liberty Local's assertion that D.P.'s juvenile records are not publicly available.  (*Id*.)

Liberty Local then filed its second Motion to Strike, in which it asks the Court to strike both Attorney Engler's Declaration and the two-paged copy of the October 30, 2023 Magistrate's Decision attached to the Declaration.  (Doc. Nos. 64, 65.)  Liberty Local again argues that "Plaintiff's counsel hid [D.P.'s juvenile record] from Liberty Local Schools, only to now spring it on them."  (*Id*.) Plaintiffs did not timely file a response to Liberty Local's second Motion to Strike.[14]  The Court notes that Plaintiff Blume did file an untimely, *pro se* Brief in Opposition to Liberty Local's Motions to Strike on March 3, 2025.  (Doc. No. 68.)  Therein, Plaintiff Blume does not dispute that Plaintiffs failed to produce D.P.'s juvenile records in discovery, or that D.P.'s juvenile records are not publicly available.  (*Id*.)

Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  As explained by the Sixth Circuit, district courts have an inherent power to exclude evidence as a sanction for breach of the duties set forth in Rule 26(e).  *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 344 (6th Cir. 2002), *modified on other grounds by, Roberts ex rel. Johnson v. Galen of Virginia*, Inc., 325 F.3d 776 (6th Cir. 2003).  *See also World Heritage Animal Genomic Res., Inc. v.*

---

[14] Liberty Local filed its second Motion to Strike on December 23, 2024.  Attorney Engler filed a Notice of Withdrawal on December 31, 2024, but the Court did not grant Attorney Engler leave to withdraw until February 3, 2025.  At no point prior to being granted leave to withdraw did Attorney Engler file a Brief in Opposition to Liberty Local's second Motion to Strike.

*Wright*, 2023 WL 3868646 at *3 (6th Cir. Jun. 7, 2023) (agreeing with the district court and refusing to consider certain letters as substantive evidence that were not produced during discovery); *Mason v. Arctic Cat, Inc.*, 2012 WL 1570861 at *4 (E.D. Mich. May 4, 2012) (excluding documents produced three months after the close of discovery where the producing party had not demonstrated good cause); *Morrison v. Stephenson*, 2008 WL 144850 at *1 (S.D. Ohio Jan. 10, 2008) ("It is absolutely improper for Defendants to utilize evidence in their reply that was not produced in discovery….")

Here, Plaintiffs' responses to Liberty Local's Motions to Strike fail, entirely, to acknowledge or address Liberty Local's argument that the juvenile records attached as Exhibits to Plaintiffs' Reply and Attorney Engler's Declaration were not produced during discovery.  Thus, Plaintiffs have failed to provide this Court with any basis for finding that the documents were timely produced or that the untimeliness should be excused as substantially justified or harmless.  Moreover, the Court finds that Liberty Local has been prejudiced, as the juvenile records in question do not appear to be publicly available and Liberty Local was therefore unable to utilize these records during discovery and/or summary judgment briefing.

Accordingly, and in the absence of any meaningful argument to the contrary from Plaintiffs, the Court will disregard the copies of the October 30, 2023 Magistrate's Decision in D.P.'s juvenile court proceedings, which are attached to Plaintiffs' Reply (Doc. No. 61-1) and Attorney Engler's Declaration (Doc. No. 63-1).  Lastly, the Court will disregard Attorney Engler's Declaration itself, on the grounds that it constitutes legal and factual argument and, therefore, constitutes an unauthorized sur-reply.  *See Eberhard*, 2014 WL 12756822 at *2; *West Bend Mutual Ins. Co.*, 2024 WL 2784341 at * 4.

19

## IV.    Cross Motions for Summary Judgment

### A.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

20

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

Here, the parties have filed cross-motions for summary judgment. "Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Peters v. DCL Medical Laboratories, LLC*, 305 F.Supp.3d 799, 814 (S.D. Ohio 2018). "The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion." *Id.* Rather, in reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *See Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *Allstate Vehicle and Property Ins. Co. v. Hoffa*, 566 F. Supp.3d 816, 820-821 (S.D. Ohio 2021); *Peters,* 305 F. Supp. at 814.

### B. Analysis

In Count One of the Complaint, Plaintiffs allege that Liberty Local violated Title IX when it showed "deliberate indifference to the sexual assault on J.B. by D.P. and its aftermath, and exacerbated a severe sexually hostile school environment for J.B. that D.P.'s sexual assault on J.B.

21

had created." (Doc. No. 1 at ¶ 16.) Specifically, Plaintiffs allege that Liberty Local "showed [its] deliberate indifference to J.B. by engaging in conduct that included, but was not limited to: (a) conducting no investigation whatsoever into the sexual assault upon J.B. by D.P.; (b) permitting D.P. to continue to attend Guy Junior High School; (c) doing nothing to separate D.P. from J.B. during the school day; (d) not disciplining D.P. in any way for his gross sexual misconduct toward J.B. that occurred on school grounds; (e) ignoring medical findings by Akron Children's Hospital that J.B. had been sexually assaulted; (f) creating for J.B., an impressible [sic] minor who had recently been traumatized, the belief that male students could sexually assault female students, with complete impunity; and (g) making no effort to provide counseling or any other form of support to J.B." (Id. at ¶ 19.) Plaintiffs allege that, as a result of Liberty Local's alleged conduct, J.B. was deprived of access to and participation in the full range of educational opportunities that should have been available to her as a student at Guy Junior High School. (Id. at ¶ 16.)

Title IX prohibits discrimination based on sex in any education program receiving federal funding.[15] *S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*, 86 F.4th 707, 714 (6th Cir. 2023); 20 U.S.C. § 1681(a). In *Davis as Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court held that "student-on-student sexual harassment, if sufficiently severe, can [ ] rise to the level of discrimination actionable under [Title IX]." *Id.* at 650. Interpreting *Davis*, the Sixth Circuit has explained that student victims of peer harassment whose harassers are "under the school's disciplinary authority" may bring two different types of Title IX deliberate-indifference claims: "before" claims and "after" claims. *S.C.*, 86 F.4th at 714–15 (quoting *Davis*, 526 U.S. at

---

[15] Here, it is undisputed that Liberty Local receives federal funding.

22

646–67).  *See also R.L. on behalf of R.S. v. Knox County, Tennessee*, 2024 WL 4695966 at * 5 (6th Cir. Nov. 6, 2024).

In the instant case,  Plaintiffs assert an "after" claim.  (Doc. No. 59 at PageID# 1095.)  A plaintiff bringing an "after" claim must show that the school: (1) has been "deliberately indifferent to sexual harassment," (2) "of which it has actual knowledge," and (3) which "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Kollaritsch v. Mich. State Univ. Bd. of Trs*., 944 F.3d 613, 619 (6th Cir. 2019) (cleaned up).  *See also Doe on behalf of Doe #2 v. Metro. Gov't of Nashville ("Doe #2"),* 35 F.4th 459, 463 (6th Cir. 2022) (citing *Pahssen v. Merrill Cmty. Sch. Dist.,* 668 F.3d 356, 362 (6th Cir. 2012)); *R.L. on behalf of R.S.*, 2024 WL 4695966 at * 5.  The "deliberate indifference" element does not require a school "to 'remedy' sexual harassment nor ensure that students conform their conduct to certain rules, but rather, the [school] must merely respond to known peer harassment in a manner that is not clearly unreasonable."  *Vance v. Spencer Cnty. Pub. Sch. Dist*., 231 F.3d 253, 260 (6th Cir. 2000) (cleaned up).  The "actual knowledge" element requires "only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment."  *Stiles ex rel. D.S. v. Grainger Cnty.,* 819 F.3d 834, 848 (6th Cir. 2016).

As for the last element (known as the "actionable harassment" element), "'[s]evere' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass."  *Kollaritsch,* 944 F.3d at 620.  "Pervasive" not only refers to conduct that is "systematic" or "widespread" but also has been construed to require "multiple incidents of harassment; one incident of harassment is not enough."  *Id*. (internal quotation marks omitted).  *See also R.L. on behalf of R.S.*, 2024 WL 4695966 at * 5.  Finally, "'[o]bjectively offensive' means

23

behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Kollaritsch,* 944 F.3d at 621.

Here, Plaintiffs argue that there is no genuine issue of material fact that they have demonstrated each element of their Title IX claim.  (Doc. No. 52-1.)  Plaintiffs first maintain that D.P.'s sexual assault of J.B. on November 18, 2021 was clearly severe, pervasive, and objectively offensive and that Liberty Local had actual knowledge of the assault as of December 2, 2021.  (*Id*. at PageID# 880.)  Plaintiffs next assert that Liberty Local was deliberately indifferent to J.B.'s Title IX claim as a matter of law.  (*Id*. at PageID#s 880-884.)  Plaintiffs argue that, during her deposition, Liberty Local's Title IX Coordinator, Principal Joseph, testified that she did not even recognize that Title IX was triggered by J.B.'s sexual assault and that this testimony "definitively show[s] that Liberty did not do anything Title IX required in response to J.B.'s report of being raped in a school bathroom."  (*Id*. at PageID# 875.)

Plaintiffs further argue that, even if Principal Joseph had recognized that J.B.'s sexual assault implicated Title IX, Liberty Local's response was "so deficient that [it] amounted to deliberate indifference as a matter of law" because Liberty Local failed to (1) remove D.P. from the school; (2) institute any measures that would assure the separation of D.P. and J.B., including ensuring that D.P. did not sit at J.B.'s lunch table; (3) discipline D.P. in any way; (4) "take J.B.'s report of harassment by other students seriously;" (5) take any remedial actions to protect J.B. from harassment by other students; (6) conduct a formal Title IX investigation; (7) "create or retain any documentation relating to any independent investigation;" (8) conduct its own independent investigation (instead of relying on the police to develop the facts); and/or (9) prepare a final investigation report.  (*Id*. at PageID#s 883-884.)

24

Liberty Local argues that Plaintiffs are not entitled to judgment in their favor (Doc. No. 57) and that, to the contrary, there is no genuine issue of material fact that Liberty Local is entitled to judgment with respect to Plaintiffs' Title IX claim (Doc. No. 53.)  Liberty Local first maintains that Plaintiffs cannot demonstrate that Liberty had actual knowledge of "actionable harassment" because there is no evidence of "pervasive" or systemic harassment; i.e., no evidence that D.P. (or any other student) actionably harassed J.B. after she reported the sexual assault to Principal Joseph.  (Doc. No. 53-1 at PageID# 929.)  Liberty Local asserts that any alleged "comments" made to J.B. by other students after J.B. reported the assault to Principal Joseph, "did not rise to the level of sexual harassment."  (*Id*.)  In sum, Liberty Local argues that the instant case involves only "one incident of harassment" and that this is not enough to demonstrate "actionable harassment" under established Sixth Circuit precedent as a matter of law.

Liberty Local goes on to argue that, even if there was evidence of "actionable harassment," it is nonetheless entitled to judgment in its favor because it did not respond to J.B.'s complaint with deliberate indifference.  (Doc. No. 53-1 at PageID#s 929-932; Doc. No. 57 at PageID#s 1071-1076.)  Rather, Liberty Local maintains that there is no genuine issue of material fact that it responded reasonably to J.B.'s report, by immediately taking the following steps:  (1) contacting the police and children's services; (2) interviewing D.P. with his mother; (3) confirming that J.B. and D.P. had no classes together; (4) "issuing a no contact order;" (5) attempting to locate and review video surveillance footage relevant to the incident; (6) reviewing classroom records to determine the date of the incident; and (7) offering J.B. "multiple resources for counseling."  (Doc. No. 53-1 at PageID# 931.)  Liberty asserts that "there is no evidence that as a result of these acts [J.B.] was more vulnerable to harassment" or that the school's response "le[d] to additional, post-actual knowledge [of] further

25

harassment."  (Doc. No. 53-1 at PageID# 931; Doc. No. 57 at PageID# 1072.)  Liberty further argues that Plaintiffs cannot show "injury" for purposes of Title IX because "there is no evidence that J.B. was denied access to educational opportunities" given that she "voluntarily decided to attend school remotely or online" and "could have physically returned to school anytime she desired."  (Doc. No. 57 at PageID# 1072.)  Lastly, Liberty Local argues that, even assuming it did not strictly comply with all of Title IX's administrative requirements, "it is well settled that no private legal damages can be premised on non-compliance with administrative requirements including any which may pertain to a post-incident investigation of sexual harassment."  (*Id.* at PageID# 1077-1078.)

The Court will address the parties' arguments separately below.

### 1.    Alleged Failure to Comply with Title IX's Administrative Requirements

In their Motion, Plaintiffs first assert that a discussion of the elements of their Title IX claim "may be superfluous" in light of Principal Joseph's testimony that she did not realize that Title IX applied to J.B.'s report that she had been raped in the school bathroom by a fellow student.  (Doc. No. 52-1 at PageID#s 875-876.)  Plaintiffs maintain that, because Principal Joseph did not understand that Title IX was triggered by J.B.'s report, Liberty Local failed to comply with any of Title IX's administrative requirements, such as providing Plaintiffs with written notice of investigative interviews, providing opportunities for Plaintiffs to review evidence gathered in the investigation, creating written documentation regarding the investigation, and creating a final investigative report.  (*Id.* at PageID# 885.)

In support of this argument, Plaintiffs rely on the conclusions of their expert, Sandra K. Schuster, that Liberty Local failed to (1) "appropriately analyze and categorize [J.B.'s] sexual assault complaint [and] recognize it as unquestionably being subject to Title IX protocol;" (2) conduct a

26

thorough, fair and impartial investigation of J.B.'s sexual assault report; (3) maintain adequate documentation of the "minimal investigative steps they may have taken;" and/or (4) comply with its own Sexual Harassment policy in numerous respects. (*Id* at PageID#s 884-885) (citing Schuster Expert Report (Doc. No. 52-2).) Plaintiffs also rely on Ms. Schuster's conclusions that Liberty Local further erred by failing to properly investigate or respond to J.B's complaints of bullying and harassment by fellow students after she reported being sexually assaulted by D.P. (Doc. No. 52-2 at PageID#s 915-916.) In sum, Plaintiffs assert that Principal Joseph's failure to follow Title IX's administrative requirements constitutes "unequivocal proof that, as a matter of law, Liberty acted with deliberate indifference" and "conclusively establishes that J.B. has proved all of the essential elements of her Title IX claim." (Doc. No. 52-1 at PageID# 876.)

In response, Liberty Local cites numerous cases for the proposition that "no private legal damages claim can be premised on non-compliance with [Title IX's] administrative requirements including any which may pertain to a post-incident investigation of sexual harassment." (Doc. No. 57 at PageID#s 1077-1078.) Liberty Local further asserts that Ms. Schuster may not offer an opinion on the ultimate legal issue of whether Liberty's conduct was deliberately indifferent under Title IX. (*Id*. at PageID#s 1081-1083.) In their Reply Brief, Plaintiffs maintain that "federal regulations have the force of law" and argue that "Liberty's total disregard for the applicable federal regulations rendered its response to J.B.'s complaint insufficient for the circumstances." (Doc. No. 59 at PageID# 1099.)

The Court finds as follows. To the extent Plaintiffs argue that they are entitled to summary judgment in their favor solely because Liberty Local failed to comply with certain administrative

requirements set forth in Title IX (and/or certain requirements in its own sexual harassment policy),[16] the Court finds this argument to be without merit.  As Liberty Local correctly notes, numerous courts (including the Sixth Circuit) have held that a school district's non-compliance with Title IX regulations and/or its own administrative policies does not, standing alone, amount to deliberate indifference.  *See Doe v. University of Kentucky*, 959 F.3d 246, 252 (6th Cir. 2020) ("Nor does [Defendant's] non-compliance with its own administrative policies amount to deliberate indifference.")  *See also, e.g., Doe v. Sumner County Board of Education*, 2025 WL 899958 at * 10 (M.D. Tenn. March 24, 2025) ("Most of Plaintiffs' arguments are based on Defendant's failure to follow Title IX regulations and Department of Education guidance. *** But "[n]oncompliance with Title IX regulations and procedures does not, by itself, establish deliberate indifference or a funding recipient's official decision not to remedy sex-based harassment."); *A.T. v. Jefferson County Bd. of Education*, 2024 WL 4333685 at *15   (W.D. Ky. Jan. 24, 2022) (finding that "defendants' noncompliance with Title IX regulations, without more, does not amount to deliberate indifference"); *C.K. v. West Carroll Special School District Board of Education*, 2025 WL 1735737 at * 10 (W.D. Tenn. June 2, 2025) ("However, [a] school's reasonable response to alleged harassment does not

---

[16]  In her Expert Report, Ms. Schuster states that she reviewed several Liberty Local policies, including (1) "Policy #1662 Anti-Harassment;" (2) "Policy #2260 Non-Discrimination and Access to Equal Educational Opportunity;" and (3) "Board Policy:  Sexual Harassment of Students (updated Jan. 12, 2021)."  (Doc. No. 52-2 at PageID# 897.)  In her Report, she suggests that Liberty Local failed to comply with certain requirements in those policies.  (*Id*. at PageID#s 914-915.)  None of these Policies are attached to Ms. Schuster's Report.  Moreover, Plaintiffs fail to attach any of these Policies to their summary judgment briefing or otherwise direct this Court's attention to where these Policies are located in the record.  In addition, Plaintiffs fail to sufficiently argue or explain, at any point in their summary judgment briefing, how Liberty Local allegedly failed to comply with any specific provision(s) of one or more of the specific Policies identified in Ms. Schuster's Report.  Lastly, Plaintiffs do not cite any authority that a school's alleged failure to comply with its own anti-harassment/anti-discrimination policies constitutes deliberate indifference as a matter of law for purposes of a private damages claim under Title IX.

become 'clearly unreasonable' because the school fails to comply with Title IX.'") (quoting *Doe v. Plymouth-Canton Cmty. Schs.*, 2022 WL 1913074 at *12 (E.D. Mich. June 3, 2022)).

Rather, in evaluating whether Plaintiffs have come forward with sufficient evidence to support their private damages claim under Title IX, this Court must consider and apply each of the elements of this claim, as articulated by the U.S. Supreme Court and the Sixth Circuit and set forth above. While Principal Joseph's deposition testimony that she did not realize that Title IX applied to J.B.'s complaint (and thus may not have complied with some or all of Title IX's administrative requirements) is concerning and may be relevant to the "deliberate indifference" element of Plaintiffs' claim, the Court finds that it does not, standing alone, necessitate the conclusion that Liberty Local is liable under Title IX as a matter of law.

### 2. Actionable Harassment

As noted above, to prevail on their Title IX "after" claim, Plaintiffs must show that Liberty Local had actual knowledge of "actionable harassment," i.e., "sexual harassment so severe, pervasive, and objectively offensive that it deprived [J.B.] of educational opportunities or benefits provided by the school." *Stiles ex rel. D.S.*, 819 F.3d at 848. *See also Kollaritsch*, 944 F.3d at 619; *R.L. on behalf of R.S.*, 2024 WL 4695966 at * 5. As discussed below, Plaintiffs and Liberty Local each believe that they are entitled to summary judgment in their respective favor with respect to this element.

Plaintiffs argue that there is no genuine issue of material fact that J.B.'s rape was severe, pervasive, and objectively offensive. (Doc. No. 52-1 at PageID# 880.) Plaintiffs assert that this single act of sexual harassment (i.e., J.B.'s rape) is sufficient to form the basis of their Title IX claim and that Plaintiffs need not prove or demonstrate that J.B. suffered any further harassment after she reported the rape to Liberty Local. (Doc. No. 59 at PageID#s 1095-1096.) Plaintiffs further argue

29

that, even assuming *arguendo* that J.B.'s rape is not alone sufficient to support a claim under Title IX, they are nonetheless entitled to judgment in their favor because they have come forward with undisputed evidence that, after she reported the rape to Liberty Local, J.B. did, in fact, report further sexual harassment, including (1) her "continued encounters with D.P." at the Middle School; and (2) repeated harassment by other students, including comments that she was "a liar" and had "wanted it" as well as threats to fight her. (*Id*. at PageID# 1097.) Plaintiffs argue that Liberty Local failed to adequately address J.B.'s reports of further harassment and that it "led her to fear for her safety at school," which caused her to "abandon Liberty Schools." (*Id*.)

Liberty Local argues that a single sexual assault is not sufficient to constitute "pervasive" harassment for purposes of Title IX. (Doc. No. 57 at PageID#s 1070-1071, 1072-1073.) Relying heavily on the Sixth Circuit's decision in *Kollaritsch v. Michigan State University,* 944 F.3d 613 (6th Cir. 2019), Liberty Local maintains that Plaintiffs are required to come forward with evidence that J.B. suffered further additional "actionable" sexual harassment after she reported the sexual assault to the school. (*Id*.) Liberty Local asserts that Plaintiffs have failed to come forward with any evidence of such post-report harassment. (Doc. No. 53-1 at PageID# 928-929.) In this regard, Liberty Local notes that, although D.P. was in school after J.B. reported the assault, it is undisputed that he did not approach her,[17] talk to her, or physically touch her. (*Id*.) With regard to J.B.'s testimony that she was harassed by other students in the hallway after she reported the rape, Liberty Local asserts that (1) there is "no corroborating evidence of ... J.B.'s allegations of harassment by other students after

---

[17] The Court finds this argument to be disingenuous. Throughout its summary judgment briefing, Liberty Local repeatedly glosses over the undisputed testimony that, after J.B. reported the rape and after Principal Joseph expressly told D.P. that he was to stay away from J.B. and have "zero contact" with her, D.P. nonetheless sat at J.B.'s lunch table on at least one of the days J.B. returned to Liberty Local. (J.B. Depo. at Tr. 131.) This demonstrates to this Court that D.P. "approached" J.B.

she reported an assault" (Doc. No. 57 at PageID# 1079); (2) the alleged comments that were made to J.B. by other students are not "sexual" in nature and, thus, do not constitute "sexual harassment" (*Id.* at PageID# 1073); and (3) the alleged comments may have been "juvenile, antagonistic, and crass" but do not rise to the level of "actionable" (i.e., severe, pervasive, and objectively offensive) harassment (*Id.* at PageID# 1072.)

In response, Plaintiffs insist that both the First, Fourth, and Sixth Circuits have "stated unequivocally that a single act of sexual harassment, if sufficiently severe, can support a Title IX claim. (Doc. No. 56 at PageID# 1062-1063; Doc. No. 59 at PageID# 1095-1096.) Relying on *Doe on behalf of Doe #2 v. Metropolitan Gov't of Nashville and Davidson County,* 35 F.4th 459 (6th Cir. 2022) (hereinafter "*Doe #2*"), Plaintiffs argue that the Sixth Circuit made clear in that decision that its previous decision in *Kollaritsch* does not apply outside the context of university students. (Doc. No. 59 at PageID# 1096.) Lastly, Plaintiffs argue that, in any event, the undisputed evidence shows that Liberty Local had actual knowledge that J.B. did suffer further actionable harassment after she reported the rape, in the form of bullying and taunting from her classmates. (*Id.* at PageID# 1097.) Plaintiffs maintain that the comments made to J.B. that she lied about the assault, "wanted it," and "led D.P. on" are "directly related to the rape" and, therefore, inherently sexual in nature. (*Id.*) While acknowledging that "standing on their own, perhaps those statements do not constitute a Title IX violation," Plaintiffs argue that the Court "must assess those statements in the context of D.P. having raped J.B." (*Id.*)

a.   **Whether Plaintiffs must provide evidence of "further actionable harassment"**

The first issue that this Court must decide is whether, for purposes of demonstrating "actionable harassment," J.B.'s sexual assault, standing alone, is sufficient to support a Title IX

"after" claim, or whether Plaintiffs must instead come forward with evidence of further, actionable harassment occurring after J.B. reported her sexual assault to Liberty Local.  The answer to this question requires a careful discussion of the Sixth Circuit's decisions in *Kollaritsch* and *Doe #2*. [18]

In *Kollaritsch,* the plaintiffs were four female students at Michigan State University ("MSU") who were sexually assaulted by male students.  *Kollaritsch*, 944 F.3d at 618.  Plaintiffs reported the assaults to the "proper administrative authorities," which undertook investigations of the assaults.  *Id*. Plaintiffs alleged that the university's response was inadequate and brought suit against the MSU Board of Trustees and Vice President of Student Affairs, asserting violations of Title IX, 42 U.S.C. § 1983, and Michigan law.  *Id*. Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6). Following a hearing, the district court denied defendants' motion with respect to three of the plaintiffs' Title IX claims, and one of the plaintiff's § 1983 claims.  *Id*. at 619.  The Sixth Circuit granted an interlocutory appeal to consider "'whether a plaintiff must plead further acts of discrimination to allege deliberate indifference to peer-on-peer harassment under Title IX."[19]  *Id*.

At the outset, the Sixth Circuit noted that "[b]y design and effect, the *Davis* Court's Title IX private cause of action against a school for its response to student-on-student harassment is a 'high standard' that applies only 'in certain limited circumstances.'"  *Id.* (quoting *Davis*, 526 U.S. at 643.) The court explained that "the *Davis* formulation requires that the school had actual knowledge of some actionable sexual harassment *and* that the school's deliberate indifference to it resulted in further

---

[18] While Plaintiffs also cite decisions from the First and Fourth Circuits, this Court is not bound by these decisions. Rather, this Court is bound by the reported decisions of the Sixth Circuit and will, therefore, focus its attention on *Kollaritsch* and *Doe #2.*

[19] The Sixth Circuit noted that, as an interlocutory appeal from the denial of a motion to dismiss, its review was "limited to pure questions of law."  *Id*.

actionable harassment of the student-victim." *Id.* (emphasis added).  The Sixth Circuit then discussed the meaning of the term "actionable harassment," in relevant part, as follows:

> We can conservatively describe "harassment," without additional qualification, as some type of aggressive and antagonistic behavior that, from the victim's perspective, is uninvited, unwanted, and non-consensual.  For student-on-student sexual harassment to be actionable under *Davis*'s Title IX private-cause-of-action formulation, it must be (a) severe, (a) pervasive, and (c) objectively offensive. *Id.* at 651, 119 S.Ct. 1661; *see, e.g., Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012) (holding that harassment comprising a shove into a locker, an "obscene sexual gesture," and a "request for oral sex" did "not rise to the level of severe, pervasive, and objectively offensive conduct" (quotation marks omitted)).
>
> "Severe" means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass.  The *Davis* Court made an explicit admonishment that "simple acts of teasing and name-calling" are not enough, "even where these comments target differences in gender." *Davis,* 526 U.S. at 651, 119 S.Ct. 1661; 652 ("It is not enough to show ... that a student has been teased or called offensive names." (quotation marks and editorial marks omitted)).
>
> "Pervasive" means "systemic" or "widespread," *id.* at 652-53, 119 S.Ct. 1661, but for our purposes, **it also means multiple incidents of harassment; one incident of harassment is not enough**. *Id.* (explaining that this cause of action does not cover "claims of official indifference to a single instance of one-on-one peer harassment"). **The *Davis* Court hypothesized that a single incident could be sufficiently severe that it would result in the articulated injury—and we do not doubt that a sexual assault would be such a severe incident—but the Court held that a single incident would nonetheless fall short of Title IX's requirement of "systemic" harassment**. *** **That a single incident is insufficient on its own to state a claim correspondingly adds further support to the requirement that at least one more (further) incident of harassment, after the school has actual knowledge and implements a response, is necessary to state a claim**. ***

*Id*. at 620-621 (emphasis added).

With the above principles in mind, the court then discussed deliberate indifference.  The court explained that, even upon establishing actionable harassment, a plaintiff "must plead and prove four elements of a deliberate-indifference-based intentional tort:  (1) knowledge, (2) an act, (3) injury, and (4) causation." *Id*. at 621.  The Sixth Circuit explained that "an act" means "a response by the school

that was 'clearly unreasonable in light of the known circumstances,' *** thus demonstrating the school's deliberate indifference to the foreseeable possibility of further actionable harassment of the victim." *Id.* (quoting *Davis*, 526 U.S. at 648).  The court further held that "[b]ecause the further harassment must be inflicted against the same victim, the plaintiff 'cannot ... premise the [further harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties.'" *Id*. at 622 (quoting *Pahssen*, 668 F.3d at 363.)  Regarding causation, the Sixth Circuit explained:

> "Causation" means the "Act" caused the "Injury," such that the injury is attributable to the post-actual-knowledge further harassment, which would not have happened but for the clear unreasonableness of the school's response. *Davis*, 526 U.S. at 644, 119 S.Ct. 1661. Importantly, *Davis* does not link the deliberate indifference directly to the injury (i.e., it does not speak of subjecting students to injury); *Davis* requires a showing that the school's "deliberate indifference 'subject[ed]' its students to *harassment*," necessarily meaning further actionable harassment. *Id.* (emphasis added). *** But the occurrence of further harassment is not enough by itself; the response's *unreasonableness* must have caused the further harassment.  *** The school's response must be clearly unreasonable *and* lead to further harassment.  But the critical point is that the response must bring about or fail to protect against the further harassment, which the Court stated as: "[T]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis,* 526 U.S. at 645, 119 S.Ct. 1661 (quotation marks, editorial marks, and citations omitted).

*Id*. (internal citations omitted) (emphasis in original).  Thus, the court explained, there are two alternative ways in which a school's "clearly unreasonable" response could lead to further harassment, i.e., "that response might (1) be a detrimental action, thus fomenting or instigating further harassment, or it might (2) be an insufficient action (or no action at all), thus making the victim vulnerable to, meaning unprotected from, further harassment."  *Id*. at 623.

Lastly, the Sixth Circuit expressly rejected plaintiffs' argument that a single, sufficiently severe sexual assault is enough to state a viable action under Title IX.  *Id*.  The court explained that plaintiffs' argument was "a misreading of *Davis*" and found that "[a] single assault – particularly

34

before notice or response—does not state a claim" under Title IX. *Id*. In sum, the Sixth Circuit held that "plaintiff must plead, and ultimately prove, an incident of actionable sexual harassment, the school's actual knowledge of it, some further incident of actionable sexual harassment, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment."[20] *Id*. at 623-624.

Three years later, in May 2022, a different panel of the Sixth Circuit held that *Kollaritsch's* "same victim requirement" does not apply to a Title IX claim in a high school setting. *Doe #2*, 35 F.4th at 468. In *Doe on behalf of Doe #2 v. Metropolitan Government of Nashville and Davidson County, Tennessee, supra*, plaintiffs Jane Doe and Sally Doe were high school students at Metropolitan Nashville Public Schools ("MNPS"). *Id*. at 461. On September 21, 2016, Jane Doe (a

---

[20] Applying these principles to the allegations in the plaintiffs' complaint, the Sixth Circuit found that none of the three remaining Title IX claims stated a claim as a matter of law, as follows. Plaintiff Emily Kollaritsch reported being sexually assaulted in January 2012. MSU completed its investigation in August 2012, and disciplined the male student in November 2012 by placing him on probation and forbidding him any contact with Kollaritsch. *Id*. at 624. Plaintiff alleged that she subsequently encountered the male student at least nine times. The Sixth Circuit found that Kollaritsch's allegations were insufficient, explaining in relevant part: "She did not provide any details or assert any facts about these encounters to show—or even suggest—that they were sexual, or that they were severe, pervasive, or objectively unreasonable. In describing her encounters in the Complaint, she suggested that these were merely their mutual presence at the same location [including in the dormitory and cafeteria]." *Id*. Thus, the court held "as a matter of law that Kollaritsch's allegations, as stated in her Complaint, do not plead actionable further sexual harassment and, therefore, she has not pleaded and cannot show causation necessary to state a viable deliberate-indifference claim under Title IX and *Davis*." *Id*. at 625. The court likewise found that Plaintiff Shayna Gross failed to sufficiently plead a Title IX claim as a matter of law. Plaintiff Gross alleged that she reported being sexually assaulted by a male student in February 2014, after which MSU investigated. MSU initially expelled the male student, but he was apparently reinstated after an appeal. Plaintiff Gross did not allege any further contact with the male student after the initiation of MSU's response, pleading only that she "could have encountered him at any time" due to his "mere presence on campus." *Id*. The Sixth Circuit held, as a matter of law, that Gross' allegations did not plead "actionable further harassment" and that she therefore "has not pleaded and cannot show causation." *Id*. Lastly, Plaintiff Jane Roe I reported being sexually assaulted by a male student in February 2014, which triggered MUS's response. MSU declined to find sexual assault, but the male student withdrew from the university in April 2014. There were no allegations that he had any contact with plaintiff Jane Roe I after the initiation of MSU's investigation, or that he ever returned to campus. The Sixth Circuit found, as a matter of law, that Jane Roe I "did not plead any facts that would show any post-response encounter, much less any further sexual harassment that was actionable." *Id*.

freshman) was subjected to unwelcome sexual activity by four upperclassmen male students in a stairwell at the high school. *Id*. at 462. The incident was recorded on video and circulated without her knowledge. *Id*. Jane Doe later became aware of the video and that people were calling her "slut" and "whore." *Id*. Jane Doe's parents reported the video to MNPS. *Id*. The school principal called in two School Resource Officers ("SROs") and questioned Jane Doe. *Id*. Jane Doe's parents asked whether it was safe for Jane Doe to return to class, and when school officials confirmed that it was, Jane Doe returned to class. *Id*. However, she was afraid to remain at the school and enrolled in a new school the next day. *Id*.

On February 21, 2017, Sally Doe (also a freshman) was led to the bathroom by a male student and pressured into performing oral sex. *Id.* The male student videoed the incident, without Sally Doe's knowledge. *Id*. School administrators learned the students went into the bathroom together, and questioned Sally Doe about what occurred, during which Sally Doe stated that "the students only talked." *Id.* Sally Doe and her mother later met with Assistant Principal Nicole Newman and an SRO where Sally Doe admitted to kissing the male student but not to any further sexual activity. *Id*. About a month and a half later, a female student posted the video of Sally Doe in the bathroom on Instagram. *Id*. Sally Doe's mother and grandmother went to the school and met with Principal Newman to report the video. *Id*. Sally Doe's mother indicated that she wanted something done and her daughter protected, but Principal Newman told her it was now a criminal matter and to contact Metro Police. *Id.*

After the video was circulated, Sally Doe was called names in the hallway and threatened. *Id*. Sally Doe's mother emailed Principal Newman detailing the harassment and seeking an alternative arrangement for the rest of the school year. *Id.* In response, Principal Newman helped arrange for

Sally Doe to finish the rest of the school year at home.  *Id*.  Sally Doe returned to the school during the summer and was again called names, such as "slut" and "whore." *Id*.  Sally Doe's mother told an assistant principal, who said she would "keep an eye out" for Sally Doe.  *Id*.  Sally Doe also attended the school the following year, during which a male student touched Sally Doe's buttocks when they were in class, took a picture, and posted the photo to social media.  *Id*.  This resulted in a fight involving three students, including Sally Doe.  *Id.*

Jane Doe and Sally Doe sued MNPS in federal court, alleging violations of Title IX and constitutional violations under § 1983.  *Id*. at 462-463.  The district court granted MNPS's summary judgment motions with respect to all of Jane Doe and Sally Doe's claims, and Plaintiffs appealed.  *Id*. The Sixth Circuit first noted that Jane Doe and Sally Doe asserted "two theories of liability under Title IX: liability for MNPS's conduct before the students were harassed and liability for MNPS's conduct after the students were harassed."  *Id*. at 464.   Regarding Jane Doe and Sally Doe's "before" claims,[21] the Sixth Circuit first found that that the district court had erred in applying *Kollaritsch*'s "same victim" requirement to these claims and thus vacated the grant of summary judgment to MNPS on these claims and remanded "for the district court to consider whether the students have presented sufficient evidence for their claims to go to the jury." [22]  *Id*. at 466.

---

[21] Under their "before" theory, Jane Doe and Sally Doe argued that "MNPS had a widespread problem in its schools: numerous instances of sexual misconduct and the dissemination of sexual images of minor students without their consent."  *Id*.  Jane Doe and Sally Doe asserted that MNPS was deliberately indifferent to these widespread problems, causing them to be sexually harassed and videoed by fellow students on school property without their consent.  *Id*. Relying on *Kollaritsch*'s "same victim" requirement, the district court determined that the students' "before" claims were precluded.  *Id*.

[22] Specifically, the Sixth Circuit found that "[t]he district court's reading of *Kollaritsch* does not take into account the very different context and facts of this case."  *Id*.  The court explained that "[i]n *Kollaritsch*, Michigan State University had no knowledge of any threat to the four female students prior to the assaults against them" and "the adequacy of the university's response could not be assessed unless the students suffered further harm."  *Id*. at 464.  In *Doe #2,* by contrast, there was evidence of numerous instances of inappropriate sexual behavior across MNPS schools, which were handled

37

Regarding Sally Doe's "after" claim, the court noted that Principal Newman (1) responded by saying that the matter "was out of her hands" and telling the mother to contact the police; (2) did not recall informing the head of the school about this meeting; (3) did not refer Sally Doe to the Title IX coordinator or any other administrator; and (4) did not provide Sally Doe or her mother with information about any steps that the school would take to address the consequences of the incident. *Id.* at 467.  "Sally Doe continued to suffer further harassment every day at school." *Id.*  The school, however, "took no additional action, other than assisting her parents with arranging homeschooling." *Id.*  Based on these facts, the Sixth Circuit found that "a reasonable jury could conclude that, rather than take steps to remedy the violation, MNPS opted to avoid the problem, resulting in Sally Doe having no choice but homeschooling or enduring further misconduct."  *Id.*  The Sixth Circuit, therefore, reversed the district court's grant of summary judgment to MNPS on Sally Doe's "after" claim.

The Sixth Circuit then vacated the district court's grant of summary judgment to MNPS on Jane Doe's "after" claim.  *Id.* at 468.  The court explained as follows:

> Unlike Sally Doe, Jane Doe's Title IX "after" claim was dismissed pursuant to *Kollaritsch.  Kollaritsch* dealt with university students. 944 F.3d at 618. **Cases that we have decided since *Kollaritsch* have applied the decision only to universities.** *See, e.g., Doe v. Univ. of Ky.*, 971 F.3d 553, 555 (6th Cir. 2020). **Jane Doe, however, was a high school student when the sexual harassment of which she complained occurred.  Due to the varying degrees of oversight that these two kinds of institutions exercise over their students, the distinction between a university and**

---

on an individual basis by the principals of the schools involved rather than by the MNSP Title IX coordinator.  *Id.*  "Unlike the *Kollaritsch* plaintiffs, Jane Doe and Sally Doe allege[d] that their unwelcome sexual contact was a result of MNPS's indifference to the problem of pervasive sexual misconduct in the schools." *Id.*  The Sixth Circuit found that "[e]xtending *Kollaritsch's* same-victim requirement to Title IX 'before' claims like those here would thwart that purpose as it would allow schools to remain deliberately indifferent to widespread discrimination as long as the same student was not harassed twice." *Id.* at 465.  The court further held that "[w]hen a student shows that a school's deliberate indifference to a pattern of student-on-student sexual misconduct leads to sexual misconduct against the student, *Kollaritsch's* requirements for causation have been satisfied." *Id.*  The Sixth Circuit also expressly noted that "'[b]efore' claims require that more than a single incident of sexual misconduct occur to trigger liability, a requirement that mirrors *Kollaritsch*." *Id.* at 466.

**a high school makes a difference for the purposes of a student-on-student-harassment claim under Title IX.**

"Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment." *Davis,* 526 U.S. at 644, 119 S.Ct. 1661. The Supreme Court has underscored that the standard for imposing liability on a school under Title IX for deliberate indifference to student-on-student harassment "is sufficiently flexible to account ... for the level of disciplinary authority available to the school." *Id*. at 649, 119 S.Ct. 1661. Authority depends largely on the level of schooling. Universities, for instance, cater primarily to adult students. *See Foster,* 982 F.3d at 970; *Kollaritsch,* 944 F.3d at 621–22. For this reason, the Court recognized that "[a] university might not ... be expected to exercise the same degree of control over its students" as other kinds of educational institutions would be required to exercise. *Davis,* 526 U.S. at 649, 119 S.Ct. 1661. With the salience of control in mind, an *en banc* majority of this court recently stressed the importance of analyzing a Title IX claim within the institutional setting from which it arose. *See Foster*, 982 F.3d at 970. Juxtaposing universities to primary schools, the *en banc* court noted that liability under Title IX is on a spectrum, with "deliberate indifference claims hav[ing] special resonance when the school 'exercises substantial control over both the harasser and the context in which the known harassment occurs,' ...." *Id*. (quoting *Davis,* 526 U.S. at 645, 119 S.Ct. 1661).

In formulating the same-victim requirement, the *Kollaritsch* panel stressed the need for a university to be on notice about past incidents of harassment before being subject to liability under Title IX. *See Kollaritsch*, 944 F.3d at 622. However, because of their age, a school's power over students in high school "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Davis,* 526 U.S. at 646, 119 S.Ct. 1661 (quoting *Vernonia Sch. Dist.* 47J v. Acton, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). Indeed, the Supreme Court emphasized in *Davis* "the importance of school officials' 'comprehensive authority ..., consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools," citing cases involving high school students to support this proposition. Id. (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); citing *New Jersey v. T.L.O*., 469 U.S. 325, 342 n.9, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). **Considering this difference in oversight and recognizing that Title IX liability is to be analyzed based on the institutional setting, we decline to extend *Kollaritsch*'s <u>same-victim requirement</u> to a Title IX claim in a high school setting.**

*Id*. at 467-468 (emphasis added). The Sixth Circuit then remanded Jane Doe's "after" claim, with orders for the district court to "consider whether the claim survives without applying *Kollaritsch.*"[23] *Id*. at 468.

As one district court recently noted, "[t]hese decisions have resulted in debate on the limitations of *Kollaritsch* following *Doe #2." Sumner County Board of Education*, 2025 WL 899958 at * 13. In the instant case, Plaintiffs argue that *Doe #2* held that *Kollaritsch* does not apply in the high school context at all and that the Court should find that a single instance of sexual harassment is sufficient. Liberty Local insists that the Sixth Circuit has not abandoned the requirement that there be further harassment.

The Sixth Circuit has not directly revisited this issue.[24] However, given the "narrow wording of the directive in *Doe #2* – [i.e.,] that the same victim requirement does not apply," several district courts in this Circuit have found that "it appears that the remainder of the *Kollaritsch* analysis and holding remains in effect." *Sumner County Board of Education*, 2025 WL 899958 at * 13. *See also A.T.*, 2024 WL 4333685 at *12, *13 n.6 (rejecting argument that *Doe #2* allows "Title IX liability in a high school setting even when no new harassment occurred"); *Plymouth-Canton Cmty. Sch.*, 2022

---

[23] The district court docket sheet for this case indicates that the parties settled after remand. Thus, there is no decision or evaluation by either the district court or the Sixth Circuit regarding whether Jane Doe's claim survived "without applying *Kollaritsch*."

[24] After *Doe #2*, the Sixth Circuit has considered two cases involving high school students, neither of which directly considers the question of whether further harassment is required for an "after" claim. *See S.C. v. Metro. Gov't of Nashville and Davidson Cty*., 86 F.4th 707 (6th Cir. 2023) (affirming district court's judgment in favor of plaintiff S.C. on her Title IX "after" claim after a bench trial, where the school "did nothing" in response to "continuing and severe threats made against S.C." after plaintiff reported being sexually assaulted by a male student and being threatened and harassed by fellow students as a result of her cooperation with the school's investigation); *R.L. v. Knox Cty., Tenn*., 2024 WL 4695966 (6th Cir. Nov. 6, 2024) (affirming district court's grant of summary judgment to defendant school district on plaintiff's before and after claims because, although plaintiff had further encounters with the male student after she reported sexual harassment to the school, she did not show that the school's response to her complaints was clearly unreasonable).

40

WL 1913074 at *9 (noting that *Doe #2* merely refused to extend the same-victim requirement to claims in a high-school setting and that the standard of deliberate indifference articulated in *Kollaritsch* is still applicable)). For the following reasons, this Court agrees.

As discussed and set forth above, the Sixth Circuit's decision in *Doe #2* did not overrule *Kollaritsch* or otherwise hold that *Kollaritsch* is entirely inapplicable in the high school setting. Rather, *Doe #2* was narrower in scope — the court declined to extend *Kollaritsch*'s *same victim* requirement to Title IX "after" claims in a high school setting due to the "varying degrees of oversight" that universities and high schools exercise over their students. *Doe #2*, 35 F.4th at 467. *See also S.C.,* 86 F.4th at 713 (noting that "*Doe [#2]* distinguished *Kollaritsch*'s application to 'after' claims by explaining that a high school's elevated disciplinary authority supervision, and control over students is distinct from the university context and therefore *the same-victim requirement* does not apply to 'after' claims against high schools.") (emphasis added). Nowhere in *Doe #2* does the court state that the analytical framework set forth in *Kollaritsch,* including its "further harassment" requirement, is entirely inapplicable in the high school setting.[25]

---

[25] Plaintiffs also rely on *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000) for the proposition that the Sixth Circuit "has stated unequivocally that a single act of sexual harassment, if sufficiently severe, can support a Title IX claim." (Doc. No. 56 at PageID# 1062.) The Court finds that Plaintiffs' reliance on *Vance* is misplaced. The Sixth Circuit decided *Vance* in November 2000, not long after the Supreme Court issued its 1999 decision in *Davis*. In *Vance,* plaintiff produced evidence that she was repeatedly verbally harassed by male students during her sixth, seventh and eighth grade school years, as well as physically and sexually assaulted during both the seventh and eighth grades. *Vance,* 231 F.3d at 256-257. After the defendant school district did little to address or investigate her claims, plaintiff eventually withdrew from the school and filed suit, asserting claims under Title IX and the Kentucky Civil Rights Act. I*d.* at 257. The matter proceeded to jury trial. *Id.* At the close of Plaintiff's proof and again at the conclusion of all of the evidence, defendant moved for judgment in its favor pursuant to Fed. R. Civ. P. 50. The district court denied both motions and submitted the case to the jury, which returned a verdict in plaintiff's favor. The Sixth Circuit affirmed. The Sixth Circuit first found that plaintiff had "submitted abundant evidence of both verbal and physical sexual harassment." *Id*. at 259. The court then noted that "[a]lthough one incident can satisfy a claim, [plaintiff] has presented several instances that reflect not only severity and pervasiveness, but also circumstances that effectively denied her education." In the instant case, Plaintiffs rely on this language in *Vance* to demonstrate that J.B.'s rape, standing alone, is sufficient to state a claim under Title IX. The Court disagrees. As noted above, in *Vance*, the defendant had actual knowledge that the plaintiff suffered multiple instances of verbal and physical harassment at the hands of her male classmates over the course

Moreover, in a recent unreported decision, the Sixth Circuit considered a plaintiff's Title IX "after" claim in a high school setting and cited to *Kollaritsch* in that decision for the elements of such a claim. *See R.L. on behalf of R.S*, 2024 WL 4695966 at * 5. Although it did not directly address *Kollaritsch*'s "further harassment" requirement, the Sixth Circuit did expressly cite *Kollaritsch* for the proposition that "'[p]ervasive' not only refers to conduct that is 'systematic' or 'widespread' but also requires '*multiple* incidents of harassment; one incident of harassment is not enough.'" *Id*. (quoting *Kollaritsch*, 944 F.3d at 620) (emphasis in original). Although perhaps not determinative, the Court finds that this language in *S.C.* and *R.L.* is suggestive that *Doe #2* was not intended to (and did not) hold that *Kollaritsch*'s "further harassment" requirement does not apply in the high school setting.

Additionally, the Court notes that, in setting forth its "further harassment" requirement, *Kollaritsch* drew heavily from the Supreme Court's decision in *Davis, supra*. *Davis* concerned a school's response to harassment of a fifth grade student by another student.[26] *Davis,* 526 U.S. at 633. In that case, the Supreme Court explained the causation requirement for claims against a school in cases of student-on-student harassment as follows: "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its

---

of nearly three years. Thus, the *Vance* court's statement that "one incident can satisfy a claim" was nothing more than dicta. More importantly, in *Kollaritsch*, the Sixth Circuit expressly considered and rejected the argument that a single incident (if sufficiently severe) can state a claim under Title IX, and soundly rejected it. Thus, Plaintiffs' argument that *Vance* provides that a single act of sexual harassment is sufficient to state a Title IX after claim is without merit.

[26] In *Davis,* the plaintiff and her assailant were both fifth grade students. The Court explained that a male student fondled the plaintiff's breasts; spoke in vulgar language to her; engaged in sexually suggestive behavior toward her; told her "I want to get into bed with you" and "I want to feel your boobs"; and placed a door stop in his pants and acted in a suggestive manner toward her. *Davis,* 526 U.S. at 633–636. At the end of the string of incidents, the male student pled guilty to sexual battery. *Id*. at 634. As a result of the harassment, plaintiff alleged that her grades had dropped and she had written a suicide note. *Id*. The Supreme Court found that these actions amounted to severe, pervasive, and objectively offensive conduct, particularly given the offensive touching. *Id*. at 653.

students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis,* 526 U.S. 644-45.

The Sixth Circuit concluded that this language does not allow liability based on mere vulnerability to harassment. *Kollaritsch,* 944 F.3d at 623. Rather, the *Kollaritsch* court explained that "*Davis* requires a showing that the school's 'deliberate indifference 'subject[ed]' its students to harassment,' necessarily meaning further actionable harassment." *Id.* at 622 (citing *Davis*, 526 U.S. at 644.). The Court agrees with another district court in this Circuit that "[g]iven that the *Kollaritsch* Court's analysis regarding the requirement of further actionable harassment is based on *Davis*, a case involving fifth-grade students, the Court concludes further harassment is also required here." *Sumner County Board of Education,* 2025 WL 899958 at * 13.

Accordingly, the Court agrees with Liberty Local that J.B.'s sexual assault (although undoubtedly severe) is not sufficient, standing alone, to satisfy the element of "actionable harassment" in the Title IX context. Rather, in order to prevail on their Title IX after claim, Plaintiffs must "ultimately prove, an incident of actionable sexual harassment, the school's actual knowledge of it, *some further incident of actionable sexual harassment*, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch,* 944 F.3d at 623-624 (emphasis added).

### b. Whether Plaintiffs have come forward with sufficient evidence of further, post-report actionable harassment

The next question, then, is whether Plaintiffs have come forward with sufficient evidence of further, post-report "actionable harassment," i.e., severe, pervasive, and objectively offensive sexual harassment that occurred after J.B. notified Liberty Local on December 2, 2021 of her sexual assault.

43

Plaintiffs must also demonstrate that Liberty Local had "actual knowledge" of any such post-report, actionable harassment.

Here, Plaintiffs argue that they have come forward with undisputed evidence that, after she reported the rape to Liberty Local, J.B. reported further, actionable sexual harassment.  Plaintiffs argue that this harassment consisted of (1) her "continued encounters with D.P." at the Middle School, and (2) repeated verbal harassment by other students, including comments that she was "a liar" and had "wanted it" as well as threats to fight her.  (Doc. No. 59 at PageID# 1097.)   Liberty Local maintains that this is not sufficient, as a matter of law, to demonstrate post-report "actionable harassment" for Title IX purposes.  (Doc. No. 53-1 at PageID# 928-929

As set forth *supra*, the Sixth Circuit has explained that harassment under Title IX means "some type of aggressive and antagonistic behavior that, from the victim's perspective, is uninvited, unwanted, and non-consensual." *Kollaritsch,* 944 F.3d at 620. Further, for harassment to be "actionable," it must be based upon the student's sex, and must be severe, pervasive, and objectively offensive.  *Id.*  "'Severe' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass."  *Id.*  "Simple acts of teasing and name-calling" are not enough, "even where these comments target differences in gender."  *Davis*, 526 U.S. at 651 ("It is not enough to show ... that a student has been teased or called offensive names.") "Pervasive" not only refers to conduct that is "systematic" or "widespread" but also has been construed to require "multiple incidents of harassment; one incident of harassment is not enough." *Kollaritsch,* 944 F.3d at 620.  *See also R.L. on behalf of R.S.*, 2024 WL 4695966 at * 5.  And "[o]bjectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Kollaritsch,* 944 F.3d

44

at 621. Lastly, the Supreme Court has explained that "whether gender-oriented conduct rises to the level of actionable harassment ... depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis,* 526 U.S. at 651.

For the following reasons, and viewing the evidence in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to demonstrate that J.B. suffered "actionable harassment" after she reported her sexual assault to Liberty Local on December 2, 2021.

Plaintiffs first contend that J.B.'s "continued encounters with D.P." at the Middle School constitute "actionable harassment." (Doc. No. 59 at PageID# 1097.) The Court disagrees. It is undisputed that D.P. was present at the Middle School on both of the days that J.B. returned to the school after reporting that she had been sexually assaulted, i.e., on Friday, December 3, 2021 and Monday, December 6, 2021. Moreover, J.B. testified that she saw D.P. in the hallway and during lunch on both dates, and that D.P. sat at her lunch table on December 6, 2021. (J.B. Depo. at Tr. 129-131.) It is also undisputed that D.P. did not speak to her or physically touch her on either of the days that J.B. returned to school. (*Id.* at Tr. 129-132.)

The Court understands completely that J.B. would have preferred not to see D.P. and agrees that "she had good reason to feel that way." *M.D. by and through DeWeese v. Bowling Green Independent School District*, 709 Fed. Appx. 775, 777 (6th Cir. 2017). However, courts have found that "an assailant being in the mere presence of a victim does not constitute actionable harassment." *A.T.*, 2024 WL 4333685 at 13. This is because, to be actionable, offending conduct must be "based upon the student's sex." *Sumner County*, 2025 WL 899958 at * 7 (in Title IX context, noting that "to be actionable, offending conduct must be based upon the student's sex"). *See also Doe v. Hamilton*

45

*County Board of Education*, 329 F.Supp.3d 543, 558 (E.D. Tenn. 2018) (noting that "a *Davis* claim is only available to students who have been harassed on the basis of his or her sex"). "No matter how egregious, conduct is not actionable under Title IX if not motivated by the victim's sex." *Sumner County*, 2025 WL 899958 at * 7

Here, the Court finds that D.P.'s mere presence in the school and even (regrettably) at J.B.'s lunch table is not harassment on the basis of J.B.'s sex.[27]  *See, e.g., A.T*., 2024 WL 4333685 at * 13 (finding that plaintiff and her assailant "being in the same classroom as each other for a matter of moments" does not constitute actionable sexual harassment); *Plymouth-Canton Cmty. Schs*., 2022 WL 1913074 at *7 (finding that plaintiff's encounters with the assailant in the high school hallways did not constitute actionable harassment under Title IX because they were not sex-based or sexual harassment). Moreover, as noted above, to be actionable, harassment must be "severe." As noted above, it is undisputed that D.P. did not speak to, communicate with, or physically touch J.B. at any point during the two days that J.B. returned to school after reporting that she had been raped.[28] Plaintiffs cite no authority that, under these circumstances, D.P.'s presence in J.B.'s vicinity in hallways and lunchroom of the Middle School over a two day period rise to the level of "severe"

---

[27] The Court recognizes Blume and J.B.'s testimony that Principal Joseph represented to them that D.P. would be removed from the school and that J.B. "would be protected." (J.B. Depo. at Tr. 127-128; Blume Depo. at Tr. 29-30.)  The Court also recognizes that Plaintiffs strongly believe that Principal Joseph should have removed D.P. from the school after J.B. reported that he had raped her in the school bathroom.  However, even assuming that Principal Joseph falsely promised to remove D.P. from the school, this does not mean that his mere presence with J.B. in the hallways and lunchroom on December 3 and 6, 2021 rises to the level of actionable sexual harassment under Title IX, particularly where it is undisputed that D.P. did not speak to or physically touch J.B. at any point during either of those two days.  Moreover, it is well established that Title IX does not require that a school must expel every student accused of misconduct nor does it give victims the right to demand particular remedial measures.  *See Davis*, 526 U.S. at 648; *Stiles,* 819 F.3d at 848; *Vance*, 231 F.3d at 260.

[28] Nor have Plaintiffs directed this Court's attention to any evidence that D.P. had any contact with J.B. after she switched to Liberty Local's remote learning program.

46

sexual harassment.  Thus, the Court rejects Plaintiffs' claim that further actionable harassment occurred because J.B. saw D.P. in the school hallways and lunchroom on December 3, 2021 and December 6, 2021.

Plaintiffs next argue that J.B's repeated verbal harassment by other students (i.e., comments that she was "a liar" and had "wanted it" as well as threats to fight her) constitutes "actionable" sexual harassment.  (Doc. No. 59 at PageID# 1097.)  Liberty Local first maintains that the comments that were made to J.B. by other students are not "sexual" in nature and, thus, do not constitute "sexual harassment."  (Doc. No. 57 at PageID# 1073.)  The Court disagrees.  While calling J.B. a liar and threatening to fight her may not be inherently sexual in nature, the Court finds that the students' comments that J.B. "wanted it" and "led [D.P.] on" are sexual in nature when made in the context of J.B.'s report that she had been raped.  Or, stated differently, the Court is persuaded that, in this context, these remarks were based on J.B.'s sex and, therefore, constitute sexual harassment for purposes of Title IX. [29]  *See, e.g., Doe #2*, 35 F.4th at 462 (affirming summary judgment in Sally

---

[29] Liberty Local notes that Plaintiffs' own expert, Ms. Schuster, testified in deposition that the comments at issue did not constitute sexual harassment for purposes of Title IX. (Doc. No. 53-1 at PageID# 929) (quoting Doc. No. 46-1 at PageID# 279.) As an initial matter, the issue of whether the comments at issue constitute "sexual harassment" for Title IX purposes is a legal issue for this Court to decide – not Ms. Schuster. Indeed, as Liberty Local itself argues in a different section of its summary judgment briefing, Ms. Schuster "is not permitted to offer a legal opinion." (Doc. No. 57 at PageID# 1082-1083.) And even assuming *arguendo* that Ms. Schuster's testimony was not considered to be improper legal opinion testimony, the Court finds Ms. Schuster's testimony on this point to be internally inconsistent, confusing, and, therefore, neither helpful nor persuasive. As Liberty Local notes, Ms. Schuster first testified that comments that J.B. "wanted it" or "led D.P. on" (as well as threats to fight J.B.) are not considered sexual harassment. (Doc. No. 46-1 at Tr. 43.) But then, shortly thereafter, Ms. Schuster testified that, if bullying is "targeted to someone on the basis of sex-based or sexual identity, then sure, it can fall under sexual harassment" (*id.* at Tr. 45) and opined that "the bullying was targeted to [J.B.] because she was female and because she had made these allegations" (*id.* at Tr. 61.) In her very next breath, however, Ms. Schuster states that the comments made to J.B. by her classmates were "probably not" sexual harassment, though she believes it was retaliation. (*Id.* at Tr. 61, 62.) Thus, even if Ms. Schuster's testimony was not considered to be improper on the basis that it constitutes an opinion on a legal issue, the Court would not consider Ms. Schuster's testimony because it is contradictory and confusing.

Doe's favor on Title IX claim where sexual harassment included classmates calling her names, such as slut and whore, after she had been sexually assaulted by a male student.)

However, the Court is not persuaded that the verbal harassment suffered by J.B. was "severe" and "pervasive" for Title IX purposes.  As set forth *supra,* J.B. testified that she stopped going to school because she "was being harassed in the hallways" by D.P.'s friends.  (J.B. Depo. at Tr. 132.) As it is critical to this claim, the Court sets forth J.B.'s testimony on this issue:

Q:    So after going to school for two days, then you stopped going physically back to the Liberty campus to go to in-class instruction, correct?

A:    Yes.

Q:    Why was that?

A:    Because I was being harassed in the hallways.

Q:    Harassed by who?

A:    His friends.  And there was a lot of sides and people who wanted to fight me and—

***

Q:    Okay. Who was harassing you in the hallway?

A:    It was Ju[], T[], Ja[], [and] A[].  I think that's it.

Q:    And if I understand your explanation of what happened, during the two days after you informed the school of what happened, those individuals harassed you in the hallway?

A:    Yeah.

Q:    And when you say they harassed you, did they touch you in any way?

A:    T[] was supposed to fight me, but then my parents picked me up.

Q:    Well, tell me what was said in the hallways. I mean, I'd like to understand more about this  harassment.

48

A:      They're saying that I'm a liar and that I wanted it and that I led him on, things like that.

Q:      And when they said those things to you, how did you respond?

A:      I told Mr. Walker.

Q:      Well, when the kids were saying those things to you in the hallway, did you respond to them or did [you] just ignore them?

A:      I just walked with Layla, ignored them.

Q:      Now, how was it that you were supposed to have a fight with T[]?

A:      We texted over the weekend, and she started dating D.P., and we got into a huge argument about how she was the one that was telling me to break up with him because he raped  me, and then gets with him then next day.

**
Q:      Did you show your parents any of these [text messages]?

A:      No.

Q:      Did you show anyone from the school these [text messages]?

A:      No. ***

***

Q:      You  never did fight T[], right?

A:      No.

(*Id*. at Tr. 132-135.)  Blume likewise testified that, on the first day J.B. went back to school (i.e., Friday, December 3, 2021), J.B. called him and was upset because "people were taking sides." (Blume Depo. at Tr. 41-42.)  Blume further testified that, on the second day J.B. went back to school

49

(i.e., Monday, December 6, 2021), he got a call from Principal Palmer, who allegedly said that there were "rumors about a lot of girls wanting to fight J.B."[30]  (*Id*. at Tr.  42-46.)

Courts in this District have acknowledged that verbal harassment and threats about a prior incident of sexual assault can rise to the level of "severe" and "pervasive" harassment under certain circumstances. *See, e.g., S.C.*, 86 F.4th at 716; *Sumner County Board of Education*, 2025 WL 899958 at * 10.  In determining whether alleged verbal harassment is so severe, pervasive, and objectively offensive that it could be said to have deprived a plaintiff of access to the educational opportunities provided by the school, courts look "to the nature, frequency, and duration of the harassment, as well as its effect on the victim." *Marcum ex rel. C.V. v. Board of Education of Bloom-Carroll Local School District*, 727 F.Supp.2d 657, 669 (S.D. Ohio 2010).  Here, the only evidence before this Court of harassment of J.B. by other students after she reported the rape on December 2, 2021, consists of verbal harassment and name-calling by some of her fellow students on (at most) four days, i.e., Friday December 3, 2021 through Monday, December 6, 2021.  As the Supreme Court noted in *Davis*:

> Courts ... must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults.... in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling

---

[30] Plaintiffs do not argue (or direct this Court's attention to any evidence) that J.B. was verbally or physically harassed by other students once she began participating in Liberty Local's remote learning program.  Upon its own review of the deposition transcripts in the record, the Court notes that Blume was asked whether J.B. received any threatening messages from other students while she was participating in Liberty Local remotely from home. (Blume Depo. at Tr. 46-47.) Blume testified that "condoms would come to the house by mail." (*Id*.)  Blume did not identify who he believed sent the condoms. (*Id*.)  Moreover, while Blume testified that he told his attorney about the condoms, there is no evidence before this Court that Plaintiffs ever notified Liberty Local about condoms being mailed to their home.  (*Id*.)  Lastly, Blume testified that he "pretty much pulled J.B.'s phone" after she began participating in remote learning.  (*Id*. at Tr. 48.)  However, he did not provide any testimony or other evidence about (1) any specific instances of harassing text and/or social media messages, or (2) the nature, frequency or content of any such harassing text or social media messages, that J.B. received after she began participating in remote learning.  And even assuming *arguendo* that J.B. was harassed in this way, Plaintiffs have not directed this Court's attention to any evidence that they reported any such social media harassment to Liberty Local.

among school children, however, even where these comments target differences in
gender. Rather, in the context of student-on-student harassment, damages are available
only where the behavior is so severe, pervasive, and objectively offensive that it denies
its victims the equal access to education that Title IX is designed to protect.

*Davis,* 526 U.S. at 651–52.

The verbal harassment in this case simply does not rise to that level. As noted above, viewing
the evidence in the light most favorable to Plaintiffs, [31] after reporting her rape to Liberty Local, J.B.
(1) was verbally harassed by four other students in the school hallways on Friday, December 3, 2021
and Monday, December 6, 2021; and (2) received text messages from a female student on Saturday,
December 4, 2021 and/or Sunday, December 5, 2021 that included threats to fight J.B. As noted
*supra,* there is no evidence before this Court that she suffered any verbal harassment in the classroom
or lunchroom on December 3, 2021 and/or December 6, 2021, or that she endured any further
harassment by Liberty Local students (via social media or otherwise) once she enrolled in remote
learning. The only evidence before the Court, then, is that, after J.B. reported her rape to Liberty
Local, the verbal harassment lasted a total of four (4) days and was intermittent.

There is no doubt that the comments made by J.B.'s classmates were cruel and unkind. J.B.
and Blume were understandably upset by this harassment, and both testified that it contributed to the
decision to enroll J.B. in remote learning. However, as distressing as these allegations are, the Court
finds that the nature, severity, and duration of the verbal harassment suffered by J.B. after she reported
her rape to Liberty Local does not rise to the level of sexual harassment that has been found to be

---

[31] Liberty Local asserts that there is "no corroborating evidence of ... J.B.'s allegations of harassment by other students
after she reported an assault" (Doc. No. 57 at PageID# 1079). This argument is without merit. In evaluating whether
Liberty Local is entitled to summary judgment on Plaintiffs' Title IX claim, the Court views the evidence in a light most
favorable to Plaintiffs. Thus, in this context, Liberty Local's argument that the Court should discount J.B.'s "allegations
of harassment" by other students because it is "not corroborated" is misplaced and rejected.

51

actionable in other Title IX cases.  *See, e.g., Davis*, 526 U.S. at 633-635 (harassment included verbal

abuse and numerous acts of offensive touching, and persisted for a period of more than five months);

*Vance,* 231 F.3d at 256-259 (plaintiff suffered verbal and physical sexual harassment for nearly three

years); *Sumner County Bd. of Education,* 2025 WL 899958 at * 1-4, 9-10 (after sexual assault,

plaintiff suffered repeated verbal harassment at school for a period of three weeks, transferred to new

school in the same county, and then suffered further verbal harassment at new school).  Indeed,

Plaintiffs do not sufficiently argue or cite any Sixth Circuit authority for the proposition that the

nature and degree of verbal harassment suffered by J.B. after she reported her rape, is sufficiently

severe and pervasive to be considered "actionable" for purposes of Title IX.[32]

In sum, even viewing the above evidence in a light most favorable to Plaintiffs, the Court finds

that the alleged sexual harassment in this case is not sufficiently severe, pervasive or objectively

offensive, as a matter of law, to support a claim of denial of educational benefits under Title IX.

Thus, Plaintiffs cannot prevail on their Title IX claim.  The Court therefore denies Plaintiffs' Motion

---

[32] Although not cited for this particular issue, Plaintiffs do rely generally on the Sixth Circuit's decision in *S.C. v. Metropolitan Government of Nashville & Davidson County*, 86 F.4th 707 (6th Cir. 2023).  In that case, S.C., a high school freshman, was videorecorded engaging in sexual activity with a male student at Hunter Lane's High School.  *Id.* at 711.  S.C. did not consent to either the sexual contact or its videorecording.  *Id.*  The video was "rapidly shared on social media and third-party websites, including PornHub, and dissemination of the video led other students to harass S.C." *Id*.  This harassment included threats by other Hunters Lane students to S.C. and her family for participating in an investigation of the incident by the school and the police, including a threat that S.C.'s mother would be shot.  *Id.*  S.C. was suspended for three days for participating in the videorecording, after which she entered an in-patient facility for treatment and continued coursework for Hunters Lane remotely.  *Id.*  Two weeks later, S.C. was discharged from in-patient treatment but continued remote coursework at Hunters Lane.  *Id.* at 712.  "Because the threats continued even while schooling from home, S.C.'s family moved to a different county for the following school year."  *Id.*  Here, the Court finds Plaintiffs' reliance on *S.C.* to be misplaced.  Both the Sixth Circuit's decision, and the district court's decision, reflect that S.C. suffered extreme harassment (including the posting of the video online and threats to kill S.C and her family) over a period of several weeks.  *Id.* at 711-712.  *See also S.C. v. Metropolitan Government of Nashville & Davidson County*, 579 F.Supp.3d 999, 1022, 1028-1029 (M.D. Tenn. 2022).  As discussed above, even viewed in a light most favorable to Plaintiffs, the evidence in this case indicates that the verbal harassment suffered by J.B. after she reported her rape was not as severe or pervasive as that endured by S.C.

for Summary Judgment (Doc. No. 52) and grants Liberty Local's Motion for Summary Judgment (Doc. No. 53), on Count I of the Complaint.  Because the Court has found that Liberty Local is entitled to summary judgment in its favor on the grounds that Plaintiffs have failed to come forward with evidence of actionable sexual harassment, the Court need not reach the parties' arguments regarding whether Liberty Local showed deliberate indifference.

In closing, the Court notes as follows.  Although the Court is compelled to find that Plaintiffs failed to come forward with sufficient evidence to state a Title IX "after" claim based on the evidence presented, this Opinion should not be construed as minimizing the pain and trauma that J.B. and her family suffered as a result of this incident.  Moreover, while Liberty Local has prevailed on summary judgment on Plaintiffs' sole Title IX "after" claim, the Court believes that Liberty Local would be well advised to (1) ensure that its current and any future Title IX Coordinator(s) are properly trained to recognize when Liberty Local's Title IX obligations are triggered by a student complaint, and (2) apply its own Title IX, anti-harassment, and/or anti-bullying policies when presented with claims of student-on-student bullying and/or sexual harassment.

## V.    Conclusion

For all the foregoing reasons, Defendant's Motions to Strike (Doc. Nos. 62, 64) are GRANTED IN PART and DENIED IN PART, as set forth herein.  Plaintiffs' Motion for Summary Judgment on Liability (Doc. No. 52) is DENIED, and Defendant's Motion for Summary Judgment (Doc. No. 53) is GRANTED.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date: January 28, 2026                     U. S. DISTRICT JUDGE

53